[No. 30079.   Department Two.   January 8, 1948.]

MILES GIBSON *et al., Respondents,* v. CALIFORNIA SPRAY-CHEMICAL CORPORATION, *Appellant.*[1]

[1]Reported in 188 P. (2d) 316.

*Skeel, McKelvy, Henke, Evenson & Uhlmann* and *Altha P. Curry,* for appellant.

*Brown & Hawkins,* for respondents.

ROBINSON, J.—Plaintiffs brought this action to recover damages for loss of their apple crop. They alleged in their complaint that they had purchased from the defendant a chemical compound called "Elgetol"; that thereafter they used it as recommended by the defendant in spraying their orchard; and that as a result they lost their 1945 crop of Jonathan apples. They asked for judgment against defendant in the sum of twenty-nine hundred dollars.

The theory of the complaint was: (1) breach of express warranty; (2) breach of implied warranty; and (3) negligence in recommending the chemical product as a mildew control. The jury returned a verdict in favor of the defendant. The trial court set the verdict aside and entered an order granting plaintiffs a new trial, on the ground that it had committed error in its instructions to the jury. The defendant appealed from the order.

The contentions of appellant, California Spray-Chemical Corporation, are: (1) that there was no warranty, express or implied, and no negligence on its part; that had the jury rendered a verdict for the plaintiff-respondents, Miles Gibson and Evelyn M. Gibson, husband and wife, it would have been the duty of the court to set aside such verdict and enter

judgment dismissing the action; and that therefore any error in the instructions was without prejudice; and (2) that, in any event, there was no error in the instructions.

The facts material to a consideration of the questions raised on the appeal are these:

Respondent Miles Gibson, who will hereinafter be referred to as though he were the sole plaintiff and respondent in this case, owned a twenty-acre orchard near Selah, in Yakima county. He purchased the place in 1944. In this orchard, he had one hundred sixty-three Jonathan apple trees. He had other varieties of apple trees, but the number thereof is not shown in the record. The Jonathans were infested with mildew. The extent of the infestation does not appear; it may have been slight, or it may have been considerable.

In the winter of 1944-1945, respondent, while visiting the home of an acquaintance, one Harold Matson, who was also an employee of the appellant company, but not one of its salesmen, discussed with Matson the matter of mildew control. Matson informed respondent that he had used Elgetol as a "thinner" in 1944 and, in doing so, had noticed that it acted as an effective mildew control. On April 24, 1945, respondent went to the plant or warehouse of appellant company at Yakima and purchased six one-gallon cans of Elgetol contained in a carton. By reason of an OPA regulation, apparently requiring manufacturers or wholesalers to distribute their products through supply houses, the invoice was made out to Yakima Farmers Supply Company. The invoice in this case is headed:

"Sold to Yakima Farmers Sup. Co., Yakima, Wash. Shipped to Perham Fruit Co., Miles Gibson, R. 2, Selah. Shipped via Call."

Respondent signed the invoice, on a line below which appears the printed statement: "Signature of buyer or buyer's agent." By means of carbon paper the invoice was made out in quintuplicate. On the face of the invoice, just above the signature of respondent, in very legible type, appears the following affirmation:

"California Spray-Chemical Corporation guarantees the above material sold to be true to label, if labeled, but makes no other representation or warranty, express or implied, and shall not be held responsible for any injury resulting from the use or handling of said material whether or not used in accordance with directions. When mentioned, results from use of the corporation's products are given for information only. No representative of the corporation may vary any of the foregoing and the buyer hereby accepts said material subject to all the terms hereof."

The foregoing statement appears on each carbon copy, except the last. A witness explained the manner of distributing these invoices, or sales slips, as follows: The original is forwarded to the supply house; a copy is forwarded to the home office of the company in California; a copy is retained in the files of the branch office in Yakima; a copy remains in the invoice book; and the last copy, which does not contain the statement of nonwarranty and disclaimer, and which is in the form of a receipt and is called "Highway Transportation Receipt," is delivered to the truck driver or transportation company receiving the merchandise. In this case, only the highway transportation receipt was delivered to respondent, who received the goods and transported them to his home.

It also appears from the testimony of the respondent, and of other witnesses, that on each of the cans was a similar affirmation of nonwarranty; but none of the cans was introduced in evidence, and the exact wording of this disclaimer does not appear. Respondent testified that he did not read the disclaimer on the cans at the time of the sale.

It further appears from the testimony that appellant published a small paper called "Ortho News." The issue of this pamphlet, dated April 17, 1945, contained the following:

"Mildew Control—Mildew has been severe during the past several years on Jonathans and some other varieties of apples, with some cases of severe injury to D'Anjou and Bartlett pears and to some varieties of peaches. Growers have the choice of the standard treatment with liquid Lime-Sulfur (2 gallons or more in 100) in the 'pink', with follow-up sprays of Wettable Sulfur for calyx or later sprays, if necessary.

"To some, Sulfur would be objectionable because it delays the use of Summer Oil in the spray schedule. The grower also has a choice of ELGETOL which has shown good control of Mildew and can be followed by Summer Oil in the usual ten day interval. Suggested dosage—(1) ELGETOL 1½ pints in 100 gallons of water in the 'pink,' when buds are separated in the clusters and before the bloom opens, and (2) ELGETOL ½ pint in 100 with 3 pounds of Lead Arsenate, in the calyx spray. Note. Be sure the ELGETOL is stirred thoroughly in its container before removing the proper dosage. Careful, thorough spraying, with special attention to infected tip growth is essential for Mildew control."

Respondent testified at first that he did not read this issue of the Ortho News prior to his first purchase of Elgetol, but later, when the date of the issue was called to his attention, he changed his testimony and testified that he did read it, because he read all of the issues of that paper published in 1945. He did not read any of the issues published in 1944.

Respondent did not spray his orchard during the "pink" period, which is just before the blossoms begin to appear, but sprayed during the calyx or blossom period. He testified that during the pink period there was no water in the irrigation ditches, and, when the water was turned on, the pink period was over and the trees were then in blossom. He obtained a one-thousand-gallon container, filled it with water, and added the "recommended" amount of Elgetol. The amount he used in the first spray was one and one-half gallons of Elgetol to one thousand gallons of water; the amount used by him in the second spray was one gallon of Elgetol to one thousand gallons of water. In other words, during the "calyx" period, he applied two and one-half gallons of Elgetol. This was greatly in excess of any amount ever recommended by appellant for application during that period.

Respondent further testified that he did not remember the exact dates he sprayed his trees, but that it was during the calyx period. He stated that it was his practice to keep a record of the spray dates, on a large calendar, but that his wife, in cleaning the house, destroyed the calendar. He further stated that, when about half way through the spray

job, he observed on the cans a notice that it was not advisable to divide the contents of a can; that the ingredients were not thoroughly mixed; and that, if a division of the contents was made, it would not necessarily result in a uniform strength of mixture. According to respondent's testimony, he thereupon went to the company's plant at Yakima to find out from Dr. Regan, the company's entomologist in that city, whether he could use two gallons of the compound and thus avoid the necessity of splitting the cans. He asked Dr. Regan whether that would be too strong a dosage and the latter informed him that it would not. At the same time, he received from his informant the following formula, which was written on a piece of card paper in the handwriting of Dr. Regan, and is as follows:

"Calyx
"(1) Elgetol 2 gal.
"(2) Lead Arsenate 30 lb
"(3) Ortho Liquid Spreader 1 quart"

Respondent further testified that, after spraying his orchard the first time, it showed a burning effect on his foliage and fruit. He thereupon talked to Mr. Matson about it, and Matson explained to him that where the burning effect was taking place was where the mildew was being eradicated by the spray. Respondent emphasized the fact that he used Elgetol in the calyx spray according to the formula given him by Dr. Regan, except that he cut the strength by half.

"Q. Did you use Elgetol in the calyx spray? A. Yes. Q. According to the formula given to you by Dr. Regan, Plaintiffs' Exhibit '3', except you cut down the strength of it? A. That is right, by half. THE COURT: Objection overruled. Q. Now, what was the condition of the orchard after the calyx spray? A. Well, the whole orchard showed signs where the Elgetol was working on the mildew all right, but it didn't change the effect on the Jonathan trees. They had already been too far burned up to be burned up any more. Q. They were burnt by the first spray, were they? A. Yes. Q. And you didn't notice any appreciable additional burning after the first spray? A. No, except there was spots here and there on other varieties. Q. As I understand it, in this case you are claiming for damage to your Jonathan crop only? A. Yes, and no damage to the other varieties. . . .

"Q. Did you spray your Jonathans with Elgetol? A. They were supposed to have been all sprayed, but I had some inexperienced help out there, and they missed a few trees. Q. How many trees did they miss? A. About six. Q. What sort of crop did you have on those six trees? A. Very good. Q. Do you recall how many pounds per tree you got? A. Well, I don't know that, no. Q. How many tons of Jonathans did you take off last year, in 1945? A. Approximately five tons. Q. And where did those apples come from, which trees? A. The ones that escaped being sprayed. Q. The ones that didn't get sprayed? A. Yes. Q. Did you harvest any apples from the trees that were sprayed with Elgetol? A. No. . . .

"Q. And did you use Elgetol again, then, and apply it after you saw this brown or burn on the trees? A. I used it—I covered my whole orchard with it. Q. You used it a second time on the trees that you thought were already burnt by the Elgetol; is that right? A. Yes. Q. How much did you use the second time? A. I used one gallon of Elgetol to one thousand gallons of water. Q. One gallon of Elgetol? A. One gallon of Elgetol, plus thirty pounds of lead. Q. Plus thirty pounds of lead, and you used that on the entire orchard? A. Yes. Q. And it damaged only the Jonathans? A. Well, it did some damage to the other trees but it wasn't enough—you couldn't determine the extent to any certainty."

The evidence shows that, on May 10 and May 14, 1945, respondent purchased from the appellant further amounts of Elgetol, six gallons on May 10, 1945, and eighteen gallons on May 14, 1945. On the face of each of the invoices covering these sales appears, just above respondent's signature, the statement of disclaimer which appeared on the invoice of April 24, 1945. Respondent testified that he did not remember when he consulted Dr. Regan, but that it was just prior to the second purchase or just prior to the third purchase of Elgetol; that it was not prior to the first purchase.

Respondent described the manner in which he applied the particular spray. He stated that he sprayed his orchard twice, the first time with the "pink spray" (which, however, was not applied during the pink period but during the calyx period) and the second time, the "calyx spray." He stated that he did not remember how long it was after the first spray that he applied the second spray, but that it was not

too long, probably a week or ten days. Concerning subsequent events, he testified:

"Q. After you noticed the damage to the crop, did Mr. Matson come to your place? A. Yes. Q. And what did he say at that time? A. Well, he explained that where the burning effect was, was where the mildew was, and it was correcting the mildew, and, according to his notion, I got an excellent job of thinning the Jonathans. Q. Did he have anything to say about your loss of crop? A. No. Q. You called it to his attention? You gave him notice that you had lost your crop? MR. McKELVY: Objected to as leading. A. Not at that time, no. Q. Did you at a later date? A. Yes. Q. When was that? A. Well, I don't know exactly, but he and another man—I don't recall his name, he came up from California, he was with the Corporation—they went out and they looked at the trees to see the extent of the loss."

The evidence shows that Elgetol is a new product discovered during the war and which is still in the experimental stage, and that respondent was so informed and had full knowledge of this fact. Prior to 1945, it had never been used in Yakima valley or elsewhere for the specific purpose of mildew control. It had been used, however, as a dormant spray for aphis control and, during the blossom period, as a blossom thinner. The action of the product seems to be that it prevents or retards pollen germination in the blossoms around the center or king blossom and in this way acts as a thinner. In 1944, it had been used to a considerable extent by orchardists as a thinner (two gallons to one thousand gallons of water applied during the blossom period), and, in their use of it as a thinner, the orchardists had noticed that it also acted as a good mildew control—dried up the mildew.

Respondent testified that, in his talk with Matson during the winter of 1944-1945, Matson informed him that the company did not recommend it as a thinner, on account of the risk that might be involved by so doing. We quote his testimony:

"Q. You said, Mr. Gibson, that Matson told you that they would not recommend the product for the purpose of a chemical thinner; is that right? A. That is correct. . . .

Q. You have already said Mr. Matson told you it was too risky as a thinner. What did he tell you why it was too risky? What was the reason? A. They hadn't experimented with it long enough to determine whether it was safe to use it or not. Q. Whether it was safe to use it for what? A. Chemical thinning. Q. He didn't say, did he, Mr. Matson had used it himself for chemical thinning? A. Yes. Q. And it had worked all right? A. Yes. That is what he told me."

Respondent called many witnesses who testified that during 1945 they used the product and had had a similar experience with its use—it killed their apple crop. On the other hand, appellant called many witnesses who testified that they had used Elgetol during 1945 and had had no such experience, and that they intended to use it again for blossom thinning in 1946.

It further appears that during the war period experienced orchard help was very scarce and difficult to obtain, and that blossom thinning by hand is slow and expensive. These were some of the reasons why orchardists were on the constant lookout for new and better methods of insect control and blossom thinning, superior to the old standby of lime and sulphur.

We think the evidence, as outlined above, is insufficient to support a verdict for the respondent. There was no warranty in connection with the sale, but, on the contrary, an express disclaimer of any warranty, if not an express agreement that appellant should not be responsible for any result caused by use of the material, whether used in accordance with directions or not. Respondent was informed by Matson, and it was general information, that the product was in the experimental stage.

Nevertheless, respondent used it during the thinning period in the same quantity as it would be used as a mildew control, if not in a greater quantity. The fact that the purpose he had in mind in using it at that time was for mildew control instead of thinning would not change the effect of the notice given him that the company would not assume any responsibility.

■ Where a purchaser accepts goods with notice of disclaimer of warranty, there can be no recovery against the vendor upon a claimed breach of warranty. *Seattle Seed Co. v. Fujimori,* 79 Wash. 123, 139 Pac. 866; *Larson v. Inland Seed Co.,* 143 Wash. 557, 255 Pac. 919, 62 A. L. R. 444; *Puratich v. Pacific Marine Supply Co.,* 184 Wash. 531, 51 P. (2d) 1080; *Hoover v. Utah Nursery Co.,* 79 Utah 12, 7 P. (2d) 270; *Pyle v. Eastern Seed Co.,* 198 S. W. (2d) (Tex.) 562; *Lumbrazo v. Woodruff,* 256 N. Y. 92, 175 N. E. 525, 75 A. L. R. 1017; *Leonard Seed Co. v. Crary Canning Co.,* 147 Wis. 166, 132 N. W. 902, 37 L. R. A. (N.S.) 79, Ann. Cas. 1912D, 1077; *Kennedy v. Cornhusker Hybrid Co.,* 146 Neb. 230, 19 N. W. (2d) 51, 160 A. L. R. 351; *Ross v. Northrup, King & Co.,* 156 Wis. 327, 144 N. W. 1124.

■ Where the seller expressly refuses to give a warranty, no warranty inconsistent with such refusal can be implied by law. *Luten v. Earles,* 109 Wash. 550, 187 Pac. 349; *Leonard Seed Co. v. Crary Canning Co., supra*; Rem. Rev. Stat., § 5836-71 [P.P.C. § 853-1].

■ The reason assigned by the trial court for not giving effect to the notice of disclaimer printed on the invoices or sales slips was that the sales slips evidenced a contract of sale to the Yakima Farmers Supply Company, not to the respondent. To quote the language of the court in its memorandum opinion:

"The defendant [appellant] seeks to hold the plaintiffs [respondents] bound by the disclaimer of warranty, which is a part of the original invoices, Exhibits 7, 8 and 9. Under the rules above stated, these writings would be subject to explanation by parol evidence of the price agreed to be charged, because, at the time of signing, they contained no statement thereof. To sustain its position, however, the defendant must go farther and show that the sale evidenced by the writing was not to the Yakima Farmers Supply Company, as it states, but to the plaintiffs. This, under the authorities, the defendant cannot do. To show that the contract was actually with the plaintiffs, rather than with the Yakima Farmers Supply Company as the writing indicates, would be to vary and contradict its terms by parol. Therefore, upon the face of the instrument itself, it is made to appear that it

refers to a sale of Elgetol from the defendant to the Yakima Farmers Supply Company, and that Miles Gibson signed not as the buyer, but as the buyer's agent. Such being the case, the disclaimer of warranty is not effective as between these parties, since it was not made a part of any contract between them. The court is satisfied, as alleged by both parties, that there was a sale of Elgetol by the defendant to the plaintiffs; but that sale is not evidenced by the written contract between the defendant and the Yakima Farmers Supply Company, Exhibits 7, 8 and 9. Rather, the court feels that the sale from defendant to the plaintiff Miles Gibson was an oral transaction, which culminated in the delivery of the Elgetol to him upon his agreement, express or implied, to pay therefor to the Perham Fruit Company.

"The court concludes that the disclaimer of warranty is, therefore, not a part of any contract between the plaintiffs and the defendant, and that therefore it is not binding upon the plaintiffs in this action."

We think this reasoning is faulty. Respondent was at least put on notice that the company disclaimed any warranty or liability. By accepting the goods, respondent accepted these conditions.

The fact that he did not read the statement of disclaimer, if such is the fact, would not increase the liability of the company beyond what it would be had he read it. *Pimpinello v. Swift & Co.*, 253 N. Y. 159, 170 N. E. 530; *In re Stone's Estate*, 272 N. Y. 121, 5 N. E. (2d) 61; *Kennedy v. Cornhusker Hybrid Co.*, *supra*; 9 Wigmore on Evidence (3d ed.) 43, § 2415.

There is no evidence that the company concealed from respondent any information regarding the nature or action of the chemical as a fungicide or insecticide. As we have above stated, respondent had full knowledge that the product as a fungicide and as a thinner during apple blossom time was in the experimental stage. As far as the evidence shows, respondent could easily have obtained from the extension service of the United States and the state department of agriculture full information regarding the chemical most advisable to use under the conditions which then existed in his orchard. This he apparently did not do.

The case does not fall within the principles announced in cases involving foods, drugs, and products inherently dangerous to the health and safety of human beings. See *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 Pac. 633, Ann. Cas. 1915C, 140, 48 L. R. A. (N.S.) 213. Elgetol was a merchantable product. There was no danger to be incurred in using it as a dormant spray. The evidence does not show that its use is more dangerous than the old standby of lime and sulphur, taking into consideration that lime and sulphur cannot be followed by summer oils. The statement contained in the issue of Ortho News, above referred to, in our opinion, under the circumstances of this case, was not a false or negligent statement entitling respondent to go to the jury on the question of appellant's liability for consequential damages.

We also think that, under the evidence in this case, a verdict for respondent would have rested entirely upon speculation and conjecture. The evidence in the case is in such a state that it is impossible to determine at what stage of bud development respondent applied the Elgetol or that he applied the formula recommended by Dr. Regan. He testified that he had some inexperienced help, and that as a consequence six of his Jonathan trees escaped being sprayed. If he had inexperienced help, it may be that the other trees received too strong a dosage. Respondent had other fruit trees which apparently were sprayed twice in like manner as were the Jonathans. No injury was caused to these trees, only the Jonathans. Furthermore, after the first spray, and discovering, as he testified, that the fruit had been destroyed, he applied further amounts of the chemical compound. The evidence does not show the exact date he gave notice of injury to the appellant company, but it would be apparently later. Seemingly, he wanted to do a good job of killing the mildew.

Verdicts must rest upon substantial evidence, not upon surmise, conjecture, or imagination. *Reusch v. Ford Motor Co.*, 196 Wash. 213, 82 P. (2d) 556; *Belcher v. Lentz Hardware Co.*, 13 Wn. (2d) 523, 125 P. (2d) 648.

We are of the opinion that the jury returned the only

verdict that properly could have been rendered upon the evidence in this case, and that, had it rendered any other, it would have been the duty of the trial judge to set it aside. In other words, at the conclusion of the evidence, the court should have granted appellant's motion for a directed verdict in its favor.

■ Where no other verdict than that rendered by the jury could be permitted to stand, it is error to grant a new trial for erroneous instructions given or other irregularities in the proceedings. *Grass v. Seattle*, 100 Wash. 542, 171 Pac. 533; *Sellman v. Hess*, 15 Wn. (2d) 310, 130 P. (2d) 688. For this reason, it becomes unnecessary to determine whether or not the instructions given by the trial court were erroneous.

The order granting a new trial is reversed, with directions to the trial court to reinstate the verdict rendered by the jury and enter judgment thereon.

MALLERY, C. J., STEINERT, JEFFERS, and HILL, JJ., concur.

February 26, 1948. Petition for rehearing denied.