[No. 32369. *En Banc.* March 11, 1954.]

C. F. WILLIAMSON *et al., Respondents,* v. ROLF IRWIN *et al., Appellants.*[1]

[1]Reported in 267 P. (2d) 702.

*Halverson & Applegate* and *H. R. Williams*, for appellants.

*S. E. Chaffee* and *Hawkins & Sackmann*, for respondents.

SCHWELLENBACH, J.—This is an appeal from a judgment, after a jury verdict in plaintiffs' favor, in an action for the sale price of a crop of potatoes.

C. F. Williamson is a farmer residing at Sunnyside. He has been raising potatoes for about thirty-five years. During the season of 1951, he had one hundred thirty acres in crop. Rolf Irwin has been actively engaged as a grower and dealer in general produce for over twenty years.

About July 6, 1951, Irwin went with Oscar Johnson, one of his growers, to see Williamson. He testified as to his conversation with Williamson:

"I told him I was desirous of obtaining more potato tonnage to run through a warehouse that I was going to try and lease, and he said his taters were for sale, and that he wanted to sell them, field run grade. . . . We talked

about the method he wanted to sell them. I explained to him I had never bought potatoes in that manner, that most generally I had bought them by the ton for 1's and 2's, and he insisted that was the only way he was interested in selling them. . . . I made an effort to deal with Mr. Williamson on the basis that I always deal with all the rest of my growers, merely sell the potatoes for whatever they bring and charge him the brokerage for making that sale, and he stated he was interested only in selling them field run, the reason being he never would be able to get along with all the inspectors, and he thought were prejudiced against him and in all probability would give me a fairer grade than they would with him, and he didn't want to have anything to do with inspectors, and consequently was going to try and make a deal, field run grade, if possible."

As to that, Williamson testified:

"When we first met I told him, before he left, that day, I wanted $30.00 a ton, field run, as is, just as they growed."

They went out over the field and took samples. Irwin explained how this was done.

"In order to examine a field and ascertain the amount of #1's you would, necessarily, have to dig up a hill, or two, or three hills, and bunch the potatoes in a pile, and grade them for 1's, 2's and culls. I was trying to decide what per cent. of 1's they graded, in order to decide whether the price he was asking would be possible for me to pay. In each case we stopped we examined them most especially for the percentage of #1's."

No deal was made at that time.

Irwin returned to Williamson's ranch late in the afternoon of July 10th. They went back over the field and made a further examination. Then they went back to Irwin's car, where Irwin wrote the contract.

"July - 10/51

"C. F. Williamson agrees to sell and Rolf Irwin agrees to buy all the potatoes grown by same (Williamson) on his ranch north of Canal (Rosa) at Sunnyside Wash - The Buyer agrees to pay for the potatoes as they are delivered to the Phipp whse at Sunnyside at the rate of $25.00 per ton. bulk wht - Less 3% for dirt - (Field Run grade) — Also less ($10,000.00 cash advance which will be deducted from

the last of the harvest — The acreage is approximately 130. Start digging 25th day of July and to be completed by the 25th of August - 1951.

> [signed]   ROLFORD IRWIN   (BUYER)
> Grower

---

"Potatoes are to be weighed over a certified public scales by grower with the empty sacks weighed back on truck - Grower agrees to exercise proper care in digging dusting and generally caring for the potatoes through harvest —

> [signed]   C. F. WILLIAMSON"

As to the writing of the contract, Williamson testified:

"A.   He wrote out the contract at that time.  If you look at the contract he wrote out, 'bulk weight'.  I said, 'I want "field-run" '.  He said, 'It all means the same.'  I said, 'It don't make any difference, I want it "field-run" '.  Field run is just everything that grows in the field.  Q.  Referring to Plaintiff's Exhibit #1, the wording is, 'Field Run grade', is that not right?  A.  'Field run grade?'  Yeah, he put that in after he had 'bulk weight'.  That was all made right then, but I didn't want 'bulk weight', I wanted 'field run', because that's what I was selling, field run, as is, the whole crop."

At the time the contract was written and signed, it was orally agreed between them that Williamson would buy back the culls for five dollars a ton.

Williamson started delivering to the warehouse on August 1st.  The first couple of days the potatoes passed inspection.  Then it was discovered that quite a percentage of them were affected with heat necrosis, or an internal discoloration.  Potatoes so affected are graded as culls.  Under state law, all potatoes that are shipped out must secure a state shipping permit.  Any potatoes which do not meet the grade requirements of U. S. #2 or better must be marked, "culls."  The percentage of culls in the potatoes in question, after the first two days, was so high that no permit was issued.  Later, however, a different kind of potatoes was brought in, and a large percentage of them passed inspection.

Irwin at first attempted to handle the rejected potatoes on a brokerage basis.  Williamson would not agree.  Irwin

then refused to accept the questioned potatoes, and Williamson was forced to sell them elsewhere. This action was then commenced.

Williamson sued for the total amount of potatoes delivered to the warehouse, at twenty-five dollars a ton, less the amounts paid to him by Irwin, the amounts received from other purchasers of the rejected potatoes, and the amount owing to Irwin for culls purchased by Williamson at five dollars a ton, or a balance due of $24,696.34.

Irwin answered, denying the material allegations of the complaint. There were four affirmative defenses, the first alleging that defendants had fully performed the conditions of the contract and had fully paid plaintiffs. The second affirmative defense alleged that Irwin was engaged in buying potatoes and selling them for human consumption; that Williamson was engaged in growing potatoes and selling them for human consumption; that all potatoes rejected were unmarketable for food purposes. The third affirmative defense alleged that plaintiffs failed and refused to perform the contract. The fourth affirmative defense alleged:

"That the contract entered into between the plaintiffs and defendants attached to plaintiffs' complaint marked Exhibit "A" and hereby referred to, is ambiguous, indefinite and uncertain in that it refers to field-run grade of potatoes. That the plaintiffs and the defendants in entering into said contract agreed to sell and buy, respectively, potatoes which would pass inspection and were merchantable and marketable and resaleable for human consumption. That under the custom and usage of buyers and growers of potatoes the term "field-run grade" is understood to mean potatoes which are marketable for human consumption."

By way of cross-complaint, it was alleged that plaintiff fraudulently represented that the entire field of one hundred thirty acres was the same as that portion through which defendant walked prior to the execution of the contract, to defendants' damage in the amount of five thousand dollars.

The affirmative defenses and the cross-complaint were denied by plaintiffs.

The jury returned a verdict in favor of the plaintiffs in the sum of $24,696.34 on plaintiffs' complaint and also found for plaintiffs on defendants' cross-complaint.

The trial court denied defendants' motion for judgment n.o.v. or in the alternative for a new trial upon plaintiffs' complaint, provided plaintiffs agreed to a reduction of the judgment to $23,428.87, plus interest at the rate of six per cent per annum from August 25, 1951, until paid. Plaintiffs consented to the reduction. The trial court denied defendants' motion for judgment n.o.v. on their cross-complaint, but granted their motion for a new trial thereon.

Judgment was entered in accordance with the above order. Defendants appeal from the judgment against them. Plaintiffs do not appeal from the order granting a new trial on the cross-complaint.

Appellants list twenty-eight assignments of error. They consist of the allowance of testimony interpreting the term "field run grade"; in giving certain instructions; in refusing to give certain proposed instructions; in failing to grant the motion for judgment n.o.v. or in the alternative for a new trial; in granting judgment for interest from the 25th day of August, 1951 (the date of the last delivery); and that substantial justice was not done between the parties.

Most of the witnesses called by respondents in rebuttal to interpret the term "field run grade" testified that they had never heard the term used. They did testify, however, that there was no difference between "field run grade" and "field run." They testified that, with reference to custom and usage, the phrase "field run grade," in connection with a contract for the purchase of potatoes, means all of the potatoes that the digger puts on the ground, irrespective of condition or grade, and regardless of condition and quality. Appellant testified under cross-examination:

"Q. Do the words, 'field run grade', mean all potatoes in a field except potatoes affected with internal discoloration? Is that what you mean by the word, 'Field run'? . . . A. No. . . . Q. Let me put it this way: In your definition of field run grade, you exclude internal discoloration, potatoes affected with internal discoloration? A. I

never considered that as part of the deal. . . . Q. (Mr. Hawkins): Let me repeat the question, Mr. Irwin. Is it customary, in the potato industry, when you use the words, 'field run grade', to include every cull in the field, regardless of what causes it to be a cull? A. Well, I have never bought potatoes this particular way before, and I don't know what is the custom. Q. Well, don't you know field run grade means all the potatoes in the field, regardless of their condition? A. Yes, I know that. Q. Regardless of their condition, yes. And when you used the words, field run grade, you mean all the potatoes in the field, regardless of their condition? A. As they were when I bought them, yes. . . . Q. You testified yesterday, did you not, that you did not know the meaning in the trade of the words, 'field run grade'? A. No, I don't think I testified to that. I know the meaning of 'field run grade'. I think I testified I don't know how other people might treat it. Q. You don't know the customary meaning of the words, 'field run grade'? A. Yes, I do, indeed I do. Q. I am sorry, I had the other impression, I thought you testified yesterday that you did not know the meaning of, 'field run grade'. A. I know the meaning of 'field run grade.' Q. Do you know its customary meaning in the potato industry? A. Yes, field run grade is a combination of 1's, 2's and culls. Q. It means a per cent. of culls out of a particular field, including 1's, 2's and culls, doesn't it? A. Yes."

■ Error is assigned in permitting expert witnesses to testify as to the meaning of the term "field run grade" for two reasons: (1) that custom and usage was not pleaded by respondents, and (2) that the witnesses invaded the province of the jury in giving their conclusions.

Custom and usage was pleaded affirmatively by appellants. This testimony was not offered by respondents in their case in chief, but in rebuttal.

■ As to the matter of interpretation of the contract, this testimony, including the reading of the contract, was admitted without objection. The witnesses, with reference to the custom and usage in the potato industry, gave their views as to the meaning of the term "field run grade." It was not until the question was asked as to the meaning of the term with reference to potatoes affected with heat necrosis that objection was made that the question called

for an interpretation by the witness of the terms of the contract, and also called for a conclusion by the witness. It appears to us that the objection came too late.

■ Error is assigned in instructing the jury that, in the event of an ambiguity appearing in a contract drawn by one of the parties, such ambiguity is to be resolved against the party drawing it. The instruction correctly stated the law in the light of the facts heretofore related. The trial court, in other instructions, correctly instructed the jury that, in interpreting an ambiguous contract, it should determine the intent of the parties from the terms of the contract and the situation existing at the time it was entered into.

■ Error is assigned in giving instruction No. 10:

"I instruct you that the term 'field run grade' is ambiguous. I further instruct you that it is your duty to determine the meaning of that term as used by the parties here. This should be determined by taking into consideration the wording of the contract itself, the situation of the parties and what was done by them prior to the signing of the contract and also what the custom and usage of the potato industry is. If you find from the foregoing the term 'field run grade' means all of the potatoes in a given field regardless of the grade or quality, then if you find that the plaintiffs have performed the terms of the contract to be performed by them, then you must return a verdict in favor of the plaintiffs at the rate of $25.00 per ton, less 3% for dirt, for potatoes delivered at the Phipp's Warehouse by plaintiffs, less whatever credits you find plaintiffs entitled to."

However, the court also gave instruction No. 11:

"If you find from a preponderance of the evidence that the term 'field run grade' means potatoes of the condition, grade and quality as they were in the field at the time the contract was entered into, then in that event, you are instructed that it was the duty of the plaintiff to deliver such potatoes, and the defendant would not be obliged to accept potatoes of a different condition, grade and quality. It will be your duty to determine whether or not the potatoes delivered to the Phipps warehouse by the plaintiff were of the condition, grade and quality as they were in the field at the time the contract was entered into.

"If you find the meaning of the contract to be as outlined above and find that plaintiff failed to deliver potatoes in

compliance therewith, your verdict will be for the defendants on plaintiffs' complaint."  ·

The jury was properly and fairly given the theories of each party.

Appellants proposed a number of instructions relating to rights, liabilities, and duties of both parties under the uniform sales act.

RCW 63.04.160 provides in part:

"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, there is an implied warranty that the goods shall be reasonably fit for such purpose;

"(2) Where the goods are bought by description from a seller who deals in goods of that description, there is an implied warranty that the goods shall be of merchantable quality;  . . .

"(5) An implied warranty or condition as to the quality or fitness for a particular purpose may be annexed by the usage of trade;  . . ."

However, RCW 63.04.720 provides:

"Where any right, duty, or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom is such as to bind both parties to the contract or the sale."

■ We have said that there can be no implied warranty where the seller expressly refuses to give any warranty. *Marks v. Kucich*, 181 Wash. 73, 42 P. (2d) 16; *Jones v. Mallon*, 3 Wn. (2d) 382, 101 P. (2d) 332; *Gibson v. California Spray-Chemical Corp.*, 29 Wn. (2d) 611, 188 P. (2d) 316. We have never been called upon to consider the meaning of "the course of dealing between the parties, or by custom," as used in the statute.

Let us consider what was in the minds of the parties when they entered into this transaction. Irwin wanted to deal with Williamson as he had always dealt with the rest of the growers, by merely selling the potatoes for whatever they might bring and charging him the brokerage for making the sale. Williamson made it clear that he had not been able to get along with the inspectors; that he wanted to sell the entire crop, "field run, as is, just as they growed." When the contract was being written, he insisted upon "field run" being inserted. Irwin said that that was covered by "bulk wht" but, upon Williamson's insistence, he inserted the phrase, "field run grade." After this was done, Irwin then added, "Grower agrees to exercise proper care in digging dusting and generally caring for the potatoes through harvest." This was the portion signed by Williamson, although there was a place for his signature right beneath that of Irwin. If there had been any thought of the parties that Williamson was to warrant the potatoes, that clause would not have been inserted.

We are satisfied, from the course of dealing between the parties, that Williamson agreed to sell, and Irwin agreed to buy, all of the potatoes grown on the one hundred thirty acres, 1's, 2's, and culls, in a "job lot," for twenty-five dollars a ton, without any warranty of any kind as to their fitness (Irwin was taking his chances as to that), but that, for Irwin's protection, Williamson agreed to properly dig, dust, and generally care for them through harvest. Appellants were not entitled to any instructions relating to an implied warranty.

Appellants alleged, as their second affirmative defense, that at the time of entering the contract the buyer intended to buy, and the seller intended to sell, potatoes which were marketable for human consumption. Although there was testimony bearing on the issue of whether or not potatoes affected with heat necrosis were fit for human consumption, there was no evidence or testimony that such was the contract between the parties, or that the matter was discussed prior to or at the time the contract was entered into.

It would not have been proper for the trial court to instruct the jury on the question of whether or not the contract between the parties was to buy and sell, respectively, potatoes which were fit for human consumption, in the absence of any evidence to that effect. We have often held that it is error to instruct the jury on an issue upon which there is no evidence.

■ Appellants contend that, having been granted a new trial as to the cross-complaint, which alleged fraud, the entire case should be retried; that the issue to be retried is not separate and distinct from the main action, relying on *Auwarter v. Kroll,* 79 Wash. 179, 140 Pac. 326; *Cramer v. Bock,* 21 Wn. (2d) 13, 149 P. (2d) 525.

Here, respondents sued for the sum of $24,696.34. Appellants answered, denying liability in any amount other than that already paid. Appellants also cross-complained, alleging that Williamson fraudulently told Irwin that the entire crop on the one hundred thirty acres was the same as portion shown to him, to appellants' damage in the sum of five thousand dollars. None of the issues presented in this appeal will be before the court in a retrial on the cross-complaint. Appellant did not ask for rescission in his cross-complaint, but merely for damages.

Error is assigned that substantial justice was not done between the parties and that the verdict was the result of prejudice. The issue as to what constituted the actual agreement between the parties was fairly and squarely presented to the jury. We find nothing in the record to justify the charge that the jury was prompted by prejudice in arriving at its verdict.

■ Error is assigned in giving judgment for interest at six per cent from August 25, 1951, the date of the last delivery. Clearly, this was not a liquidated claim. Where a demand is for something which cannot be established without evidence regarding the quantity or amount of the goods furnished, interest will not be allowed prior to judgment. *Meyer v. Strom,* 37 Wn. (2d) 818, 226 P. (2d) 218.

The judgment is affirmed in all respects, except that the cause is remanded with direction to assess interest from September 12, 1952 (the date of judgment), until paid. Respondent shall recover his costs on appeal.

MALLERY, HILL, HAMLEY, DONWORTH, FINLEY, WEAVER, and OLSON, JJ., concur.

GRADY, C. J. (dissenting)—It is my view that the rights, duties, and obligations of appellant and respondent are governed by the written contract and RCW 63.04.160, and that RCW 63.04.720 does not apply.

Respondent had a field of potatoes that were of the white rose and netted gem varieties. Appellant handled potatoes both as a broker and buyer. The potatoes were raised for sale on the market for human consumption. Appellant sought to purchase the potatoes. Respondent expressed the desire to sell all of the potatoes that had been grown. When appellant was writing a contract, respondent was not certain that the word "bulk" meant all of the potatoes and requested that the words "field run grade" be added.

The agricultural department of Washington has provided that standard grades are U. S. No. 1 and U. S. No. 2. These grades cannot contain potatoes afflicted with internal discoloration. Before making the contract, appellant opened some of the hills of the potatoes to determine their condition as to size, and cut some of them open to determine if they had any internal defects. He found that because of their size, they ran well to No. 1's.

The contract carried with it an implied warranty that the potatoes were and would be when delivered free from internal discoloration. All of the negotiations the parties had leading up to and including the signing of the contract indicate they were contracting to sell and purchase potatoes that were marketable. To say otherwise would be to charge respondent with dishonesty and appellant with purchasing potatoes for resale as food that would not pass state or Federal inspection, and hence not marketable as potatoes to be used for human consumption.

When the white rose potatoes were delivered, inspectors discovered many of them were discolored internally. This affliction is termed "heat necrosis." The potatoes were rejected by the inspectors, and appellant declined to accept them. They were not rejected by the inspectors because they were "culls" as that word is understood to mean both in the trade and by inspection rules, but because the No. 1's and No. 2's were discolored internally.

It is my opinion that appellant was legally justified in refusing to accept delivery of the afflicted potatoes, and that respondent is not entitled to recover the contract price therefor.

When the inspectors discovered the fact that the potatoes were afflicted with heat necrosis, the whole picture changed. Respondent took the position he had contracted to sell all of the potatoes regardless of how afflicted or diseased they might be and has asserted that this was what he had in mind when he made the contract. Appellant stood on his contract and the statutory implied warranty.

The situation became complicated and confusing at the trial when it was claimed that the contract was ambiguous and that it should be submitted to the jury for both interpretation and construction; also, when it was claimed that by custom in the potato business the statutory implied warranty was excluded.

The contract is very plain to me, and it is my opinion that it covered all of the potatoes in the field that were free from internal discoloration. No claim is made that the white rose potatoes had any other defect that would have made them unmarketable.

I have not given any consideration to the counterclaim based upon the alleged fraudulent conduct of respondent because of the affirmance of the order of the trial court awarding a new trial on such issue.