[No. 38304. Department One. February 23, 1967.]

JUNE MATTHIAS et al., *Appellants*, v. LEHN & FINK PRODUCTS CORP., *et al., Respondents.*\*

*Torbenson, Thatcher, Stevenson & Burns,* by *Robert H. Stevenson,* for appellants.

*Merrick, Douglas & Burgess (F. Ross Burgess,* of counsel), for respondents.

BARNETT, J. †—The plaintiffs brought an action against all of the defendants alleging that the plaintiff, June Matthias,

\*Reported in 424 P.2d 284.

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

had purchased Ogilvie Home Permanent Wave Set in a package container from the defendant Lake-Vista Pharmacy, and that she had used the permanent wave as required by the instructions in and on the package. It was further alleged that despite following the instructions the plaintiff June Matthias' hair broke and fell out causing a permanent loss of hair and permanent physical discomfort, suffering, humiliation and embarrassment. The plaintiffs also alleged that the defendants breached their implied warranty of merchantability and/or their implied warranty of fitness for the purpose intended.

By answer the defendants denied the material allegations of the plaintiffs' complaint and affirmatively alleged that if June Matthias suffered any injury or damages, said injuries or damages resulted from her improper use of the product in question and in the failure to follow the instructions.

The case was submitted to the jury on the court's instructions and a verdict returned in favor of the defendants. Thereafter, judgment on the verdict was entered dismissing the plaintiffs' case with prejudice.

At this point we digress to note that the posture of the record does not permit a consideration as to whether or not the defendants were negligent in the preparation of the directions accompanying the product, nor may we consider the question as to whether or not the directions imparted notice to the plaintiffs that a deviation therefrom might have injurious consequences. There is no allegation or proof of any negligence on the part of the defendants or of a negligent failure to warn. Neither in the briefs nor oral argument in this court do the plaintiffs suggest that defendants were negligent in any respect. The sole pertinent exception to the giving of the instructions relating to contributory negligence and the failure of the court to withdraw the question of contributory negligence from the consideration of the jury was "failure of the defendants to prove that there was a failure to follow instructions." Thus the trial court's attention was not directed to a consideration of the

possibility of defendants' negligence in any respect nor is the issue with respect to a "failure to warn" presented.

 We have consistently held that our rules require that exceptions shall be sufficiently specific to apprise the trial judge of the points of law or questions of fact in dispute. *Roumel v. Fude,* 62 Wn.2d 397, 383 P.2d 283 (1963) and cases therein cited. Also, the rule is well established that this court will not consider matters not presented to the trial court, nor will this court review a case on a theory different from that in which it was presented at the trial level. *State v. Reano,* 67 Wn.2d 768, 409 P.2d 853 (1966).

The facts in this lawsuit started to develop when June Matthias purchased a package of Ogilvie Home Permanent Wave Set from the Lake-Vista Pharmacy. This brand of permanent had been recommended by a neighbor. The plaintiff entered the pharmacy, picked the permanent wave set off the shelf, paid for it and left.

The pertinent portion of the directions for use accompanying the Ogilvie Home Permanent Wave Set are as follows:

> IF YOUR HAIR IS BLEACHED, DYED, OR COLOR RINSED
> . . .
> *Make a pre-permanent test curl. The pin-curl method is not recommended for tinted, bleached, dyed or damaged hair . . . use only the rod-type method.*
>
> After shampoo, towel dry hair—leaving it damp. Pour a little Creme Waving Lotion into a glass or china dish and tightly recap the bottle for later use. *Part off two sections of hair which have been most affected by coloring or bleaching* and follow procedure outlined under STEP 2, WINDING and STEP 3, WAVING instructions. [Italics ours.]
>
> Take your first time-check in 2 to 5 minutes. If first time-check does not show the desired wave pattern (see Sketch under Time Chart) gently rewind curl and after 5 minutes time-check again. When desired wave pattern is reached neutralize pre-permanent test curls; rinse, dry and comb. If you are satisfied with the way your hair looks, give yourself a complete permanent based on the timing of your pre-permanent test curls.

*If at any time the pre-permanent test curls feel sticky or gummy, neutralize at once and do not try to wave any more of your hair. Your hair needs special care before you give yourself a permanent.*

. . . .

2. WINDING

Start with neckline section because this takes longest to wave. Tie front and crown hair out of way, leaving enough hair for three rows of neckline curls.

Pour small amount of Creme Waving Lotion into china or glass bowl. Re-cap bottle.

Start with upper row of neckline section. Part off strand almost as wide as curler and about ½-inch deep.

Using cotton, thoroughly saturate the strand with Creme Waving Lotion.

Fold an end paper over the strand; slide it down to cover ends and wind under to scalp. Wind evenly and smoothly but not too tightly. Fasten curler. Avoid any pull at the scalp.

When neckline section is wound, wind front and sides next; wind crown last. Then saturate each curl using all remaining Creme Waving Lotion.

Several days after June Matthias purchased the home permanent product she gave herself a permanent. She thoroughly read the directions before she started to do the permanent. Since she had tinted or bleached her hair 2 or 3 months earlier the plaintiff decided that she came within the part of the directions for hair that was bleached, dyed or color rinsed. Using the directions Mrs. Matthias made pre-permanent test curls on the top of her head near the left temple. She made the directed time check on the test curls in 2 minutes and found them to be to her satisfaction.

Mrs. Matthias' hair was most affected by the prior coloring or bleaching at its ends and near the back.

After doing the pre-permanent test curl the plaintiff began the complete permanent. When the first curl check was made, some 3 minutes after all the hair had been wound on curlers and saturated with the waving lotion, plaintiff's hair was found to be gummy and slimy. The hair was dissolving and it began to break off. The hair, however, did not come out by the roots.

The plaintiff sought medical help and in the treatment process she had to have her hair clipped causing her to wear wigs on occasion. Neither her scalp nor hair, however, was permanently damaged.

The plaintiffs make five assignments of error, three of which relate to the issue of the alleged contributory negligence of June Matthias.

Assignments of error one, two and three relate only to the propriety of the trial court's submission of the contributory negligence issue to the jury. It is contended that there is no evidence that June Matthias had not followed the directions for the use of the home permanent product, therefore, submission of the contributory negligence theory to the jury is improper. In approaching the question raised we find from the evidence that each party asserts its own interpretation of the directions for use of the product. These two interpretations are in conflict. It is the defendants' thesis that the directions require that each curl must be timed with the pre-permanent test curl time if the user has bleached, dyed or damaged hair, and not as June Matthias actually did and now argues as the proper interpretation of the directions. June Matthias contends that the directions require the user to roll or curl all of her hair and saturate each curl while rolling and then use all of the remaining creme waving lotion by resaturating, and then and only then, does the user start the timing based on the pre-permanent test curl time, which is what she did do.

The specific parts of the directions which are in question are as follows:

IF YOUR HAIR IS BLEACHED, DYED, OR COLOR RINSED

. . .

*Make a pre-permanent test curl.*

. . . .

If you are satisfied with the way your hair looks, give yourself a complete permanent based on the timing of your pre-permanent test curls.

. . . .

2. WINDING

. . . .

Start with upper row of neckline section. Part off strand almost as wide as curler and about ½ inch deep.

Using cotton, thoroughly saturate the strand with Creme Waving Lotion.

. . . .

When neckline section is wound, wind front and sides next; wind crown last. Then saturate each curl using all remaining Creme Waving Lotion.

A summarization of the evidence pertinent to the question raised by the plaintiffs' challenge to the submission of the contributory negligence issue to the jury follows.

The plaintiff stated that she did the pre-permanent test curl because it was required in the directions for hair that had been bleached, dyed or tinted, and that she had bleached or tinted her hair some two or three months before. On cross-examination the plaintiff admitted that she did not follow the directions on where to make the pre-permanent test .The directions require the test to be made in the area most affected by the tint or bleach. We repeat the plaintiff's own words on this matter:

Q. Don't the instructions say to give the test curl in the sections of the hair where its most affected by the bleach or any dyeing? A. Yes, sir. Q. But you didn't do that? A. Because I couldn't see the back of my head, to test curl. Q. But you gave your test curl in a place other than what the instructions said to do? A. Well, yes. Q. Pardon? A. Yes.

After making the pre-permanent test and determining the time of the test curl, the plaintiff continued with the complete permanent. The plaintiff rolled up her hair in individual curls and saturated them with the waving lotion as she did the winding. Then, when she had completely rolled her hair the plaintiff used all the remaining waving lotion to again saturate the curls. This winding process took about 15 to 20 minutes in the plaintiff's estimation. After the winding had been done the plaintiff started her time check, using the pre-permanent test time as her standard. She checked her hair 3 minutes after she started to watch the time, which indicates that some of the waving lotion was on the hair at least 18 minutes. At this time check the

hair was discovered to be gummy and slimy and it started to break off.

Mr. Forim, quality control manager for the defendant manufacturer, testified as follows on direct examination about the reason for the pre-permanent test and the need to test on hair most affected by prior bleach, tint or damage.

Q. Then, what occurs to the hair when it has been bleached? I think you said it is more porous, is that correct? A. It becomes more porous and more absorbent. Q. Now, when you apply ammonium thioglycolate to that portion, does it absorb that solution—A. That's right. Q.—faster? A. That's right. It will absorb it just like it does water and cause swelling. Q. Will that result in a faster curl? A. That's right. That is exactly what happens. Q. Now, then, is this the reason you have that section in there? A. Correct. Q. Will this enable them to select a timing that will prevent damage over the rest of the head? A. That's correct, because anybody that started off with pre-treated hair and did a pre-test curl, if the test curl felt slimy or it felt gummy, knows immediately that they cannot use it. If the time element is such, for example, that it occurs too rapidly, that you cannot actually give yourself a permanent wave, common sense would say, Don't use it. You can't do it in that time. . . . . Q. But you expect that each individual that has damaged or dyed hair, that they will establish their own time length for applying the permanent? A. Definitely. Q. And that is why that section is in there, is that correct? A. Correct. Q. Now, if they establish the time period through the use of this, is that time period to be used over the rest of the head? A. The time period is to be used over the rest of the head, yes, as long as it—there is no more—In other words, if the worst damaged section had been used for the test curl, and then no portion of the head that would be treated in the same time, taking the same elapsed time—in other words, the time it takes to roll it up plus the time in allowing the saturation to occur with the increase of the waving lotion, you should get no other reaction. That is the purpose of the test curl.

On cross-examination by counsel for the plaintiffs, Mr. Forim gave the defendants' interpretation of the directions as follows:

Q. If that is true then, Mr. Forim, where in your directions do you take care of the time period from the time you start rolling, from the time you start rolling your first curl until you get done with your head? A. Your test curl,—Q. Then you start your timing—A. Your test curl—it says you apply it, roll it, and check it after two minutes. This includes the time elapsed for the time it takes to roll. Q. Would you explain that answer? I don't understand that. A. That two minutes check that you read on there, from 2 to 5 minutes—your first time-check in two minutes takes into consideration the fact that on this original bit of hair that you're starting to wave, you wet it down with a permanent wave solution, put an end paper on it, roll it up, and saturate it with some more solution. Now, two minutes from that point you check it. This is taking into consideration that you had started to apply that wave lotion right at the beginning of the waving operation. So you have a time elapsed period plus two minutes. Q. Well, then after you're through with that—A. In other words, that is the short time that it takes to roll that hair—Q. Then after that you have to roll up the rest of your hair and apply the solution? A. That's right. Q. But you don't take a time check on that? A. Certainly, you do. Q. Does it say to take a time-check? A. It says you are to take a time-check and you are not supposed to exceed the time that you used to pretest the curl. That is the purpose of it, to determine the time you require as an individual. Q. Then you mean to tell us that as a woman rolls up her hair, if the pretest curl is five minutes, she has to on each little curl that she rolls up start again on the 5-minute check before she starts the concluding time-check, if your hair is hard to wave, normal, and easy? A. That's right.

Dr. Michael J. Scott, a specialist in dermatology, testified as an expert for the defendants. He said that in his medical experience he has found injury or damage from cold wave permanents is caused in one of two ways. In the first group he classified those persons who are sensitized to the contents of the cold wave permanent. The other group of injuries or damage is caused by improper application of the cold wave permanent in some manner or fashion.

On direct examination Dr. Scott testified as follows as to the cause of the plaintiff's damaged hair:

Q. All right. Doctor, based on the history you obtained in your examination of Mrs. Matthias and your knowledge of cold waves and of the hair and of the individual's make-up, do you have an opinion as to what caused the damage to Mrs. Matthias' hair? . . . . A. If I have a—I have an opinion. . . . Q. Give us the opinion and then tell us why. A. Fine. It is my opinion from the information that I have at hand that this individual does not have a sensitized skin. In other words, she is not in the group of being—reacting to sensitization, and therefore, that in some way or another the reducing agent was left on the hair too long. . . . The reasons for that are, again, I was handicapped in my history of this woman because, as I read in my report, I could only get certain questions for her to answer, but from the ones I did have her answer, she stated that she did do a test curl. If this individual or any individual is sensitive to a particular thing, she would get a reaction on the scalp if she is sensitive. And also from testimony that you now give me that this other doctor stated that he did a patch test and did not get a reaction. In part, that would tend to put stress on it to the effect that she is not sensitive to the particular chemicals that were used.

In other words, this is not the history that is obtained from an individual who gets a reaction because she is sensitized. Therefore, that leaves you with the second group, that therefore in some way that this product was left on too long. However, I was unable to get that information from this individual. I questioned her along that line. She would state only that a Mr. Stevenson told her to say only that she followed the directions. But from the evidence that I have, and what I have listened to the way you put the questions, and what other doctors have said there, I believe—my own belief is that in some way or another this reducing agent or the ammonium thioglycolate was improperly applied, and I believe it was left on too long.

On recross-examination by counsel for the plaintiffs, Dr. Scott discusses the use of the pre-permanent test curl and the time period determined by it. Dr. Scott states:

Let's say an individual did a test curl and they found out by that test curl that they've got as sufficient curl as they wanted in "x" period of time. And that "x" period of time can vary, if you want from one minute to an hour;

550

but I'm just saying an "x" period of time they determined with their own hair using that particular preparation, they got the curl that they want. If they follow the other directions for the entire scalp and used the "x" period of time, they should get the same results that they got on that test curl. In other words, the test curls determine that factor "x", "x" period of time. That is the only thing to my mind that is up to the individual to determine.

Furthermore, he continued on to say, "So I am saying that the only reason for the pretest curl is to determine the time that it's going to be left on that individual's head."

Our perusal of the directions convinces us that they are ambiguous. The trial court was not invited to construe them. We also note that the testimony as to the meaning of the directions was received without objections. Such testimony, even though it may have been properly excluded on timely objection, makes the issue of fact. *Thompson v. Porter*, 21 Wn.2d 449, 151 P.2d 433 (1944). As the testimony interpreting the directions was unobjected to when received into evidence it could be considered by the jury and by this court on appeal. See *Williamson v₁ Irwin*, 44 Wn.2d 373, 267 P.2d 702 (1954); *Carraway v. Johnson*, 63 Wn.2d 212, 386 P.2d 420 (1963).

In our view of the evidence as detailed in this opinion there was sufficient evidence to justify the submission to the jury of the defendants' theory of contributory negligence, *i.e.*, the plaintiff failed to follow the directions with the product. A party is " . . . entitled to have its theory of the case presented to the jury by proper instructions, if there is any evidence to support the theory." *Owens v. Seattle*, 49 Wn.2d 187, 193, 299 P.2d 560, 61 A.L.R.2d 417 (1956); *Getzendaner v. United Pac. Ins. Co.*, 52 Wn.2d 61, 322 P.2d 1089 (1958). Reviewing the instruction on contributory negligence with this rule in mind and considering the evidence in the record we are satisfied that the jury was properly instructed.

Next, the plaintiffs contend that the court erred in allowing Dr. Scott to testify as to alleged mistreatment by June

Matthias' own doctor. We do not find this contention meritorious. Dr. Scott testified that the products recommended by the plaintiff's doctor were designated by the manufacturer for seborrheic dermatitis which is dandruff. No contention was made by the plaintiffs that a dandruff condition was created by the permanent wave product. The testimony was admissible for the purpose of showing that the treatment was for some other condition than that complained of because the defendants, in their answer, denied that the plaintiff June Matthias, incurred medical expenses as a result of the loss of hair.

█ Finally it is urged that Dr. Scott should not have been permitted to express an opinion as to the cause of the loss of hair because he examined the plaintiff merely for the purpose of becoming a witness at the trial. Dr. Scott examined the plaintiff in behalf of the defendants. The rule contended for by the plaintiffs applies only where a doctor examines on behalf of a plaintiff and then testifies in behalf of that plaintiff; therefore, plaintiffs' objection has no applicability in this case. *Hinds v. Johnson,* 55 Wn.2d 325, 347 P.2d 828 (1959).

Judgment affirmed.

HILL, ROSELLINI, OTT, and HUNTER, JJ., concur.