[No. 394-1.    Division One—Panel 1.    May 3, 1971.]

WYATT H. HUNTER et al., Appellants, v. WALTER S. BROWN et al., Respondents.

*Jack E. Tanner,* for appellants.

*Williams, Lanza, Kastner & Gibbs* and *Joseph J. Lanza,* for respondents.

JAMES, J.— Plaintiff, Mrs. Chung Hunter, claims damages suffered as a result of an allegedly unsuccessful dermabrasion procedure performed by defendant, Walter S. Brown. Dr. Brown is a medical doctor whose specialty is plastic and reconstructive surgery. At the close of Mrs. Hunter's case, the trial judge sustained Dr. Brown's challenge to the sufficiency of the evidence. Mrs. Hunter appeals from the judgment of dismissal which followed. We therefore review but do not weigh the evidence. Our sole function is to determine if, when viewed in the light most favorable to her, there is substantial evidence to support Mrs. Hunter's legal theory.

[A] motion for dismissal or for directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the opponent's evidence, together with all reasonable inferences arising therefrom, and requires a most favorable interpretation thereof. No element of discretion is involved, and such motions can be granted only when the court can say, as a matter of law, there

is no substantial evidence to support the opponent's claim. [Citations.]

*Frasch v. Leedom,* 62 Wn.2d 410, 414, 383 P.2d 307 (1963).

Thus viewed, we find that there was substantial evidence which, if believed, would tend to establish that during pregnancy Mrs. Hunter became concerned about dark spots of increased pigmentation which appeared upon her face. She consulted Dr. Brown who diagnosed her condition as chloasma. He described chloasma as

> a darkening of the skin in various spots. Primarily, it is thought to be caused, in part, to overexposure to sun or exposure to wind, and sometimes the use of cosmetics. But it is a thing that is certainly connected some way with the hormone setup of a woman's body, because it occurs much more frequently in females than it does in males, and more so in dark skinned people than in light skinned people.

Dr. Brown recommended and thereafter performed a surgical procedure known as "dermabrasion." Dermabrasion is a mechanical procedure whereby the epidermis is removed by sandpapering. Although performed under local anesthetic, the recovery period was for Mrs. Hunter a painful, prolonged and embarrassing experience. Rather than improving Mrs. Hunter's appearance, the dermabrasion resulted in increased pigmentation in her face.

Mrs. Hunter argued three legal theories to the trial judge. They were: (1) that Dr. Brown guaranteed he would completely clear her complexion; (2) that the dermabrasion procedure was negligently performed; and (3) that the dermabrasion was performed without her "informed" consent. However, on appeal Mrs. Hunter urges only the "informed consent" theory.

The evidence upon which Mrs. Hunter relies would permit findings that: Dr. Brown is a recognized expert in the treatment of chloasma by the dermabrasion process; that he knew (1) that the probability of a good result was only 50 per cent; (2) that there was a possibility of resulting hyperpigmentation—a worsening of the chloasma condition;

(3) that the risk of hyperpigmentation is greater when the patient is of Oriental origin; and (4) that he considered Mrs. Hunter to be a "borderline case." Mrs. Hunter is of Korean extraction.

The evidence would further support a finding that Dr. Brown did not inform Mrs. Hunter that there was any possibility that the operation would not be successful, and that Mrs. Hunter was justified in assuming that there was no question but what the dark spots on her face would disappear.

Dr. Brown was called as an adverse witness. He testified that it was not good standard medical practice within the specialty of plastic and reconstructive surgery to inform a patient of the risk involved in a dermabrasion operation. He said:

Now, if we go into the risks involved, I would be talking the rest of the day about the risks. . . .

. . .

. . . [R]isks are minimal, and they are never mentioned to a patient.

. . .

. . . A patient would walk out of everybody's office if you would say there is a danger of anything. This is never done.

. . .

It is not good practice to frighten a patient by telling them a dozen different things that might happen as a result of dermabrasion.

Mrs. Hunter produced no evidence to contradict Dr. Brown's testimony.

Dr. Brown was not interrogated as to whether there was a recognized medical standard as to disclosure to a patient of the percentage probability of success. Mrs. Hunter presented no other testimony concerning medical standards.

The trial judge felt that he was compelled to dismiss Mrs. Hunter's case because she produced no evidence of a medical standard of disclosure.

Damages are recoverable from a surgeon who operates without the consent of his patient.

The rule is well established that in surgical cases, consent to such procedure must be obtained from either the patient, or, if the patient is under some disability, from a near relative capable of giving consent. 70 C.J.S. *Physicians and Surgeons* § 48, *et seq.*, 1 Harper & James, Torts § 3.10, p. 235; The Law of Medical Practice § 1.05, p. 10.

*Grannum v. Berard,* 70 Wn.2d 304, 306, 422 P.2d 812 (1967).

Justice Cardozo's opinion in *Schloendorff v. Society of N. Y. Hosp.,* 211 N.Y. 125, 105 N.E. 92 (1914) is frequently cited for its postulate that an unpermitted touching of a person by another is a tortious battery—a willfully inflicted wrong.

Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages.

*Schloendorff v. Society of N. Y. Hosp., supra* at 129.

It is also well established that damages are recoverable from a physician who undertakes a surgical procedure for which he has not obtained a patient's "informed" consent.

A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment.

*Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees,* 154 Cal. App. 2d 560, 578, 317 P.2d 170 (1957). It can be argued that logically, an "uninformed" consent is tantamount to *no* consent and that surgery performed thereafter should be treated in law as a battery. This has been the holding in some jurisdictions. *Cf. Dow v. Kaiser Foundation,* 12 Cal. App. 3d 488, 90 Cal. Rptr. 747 (1970). However, most courts have chosen to ascribe the compensable wrong to a breach of duty on the part of the physician, rather than an assault. Although not in agreement as to the precise nature of the "wrong," courts have generally but with resulting confusion labeled the breach of duty theory as the doctrine of

"informed consent." See Plante, *An Analysis of "Informed Consent"*, 36 Fordham L. Rev. 639 (1968).

In only two Washington cases has the doctrine of "informed consent" received appellate court consideration. They are *Watkins v. Parpala*, 2 Wn. App. 484, 469 P.2d 974 (1970), and *Mason v. Ellsworth*, 3 Wn. App. 298, 474 P.2d 909 (1970).[1] The decisions afforded the trial judge no guidance as his judgment of dismissal was entered on March 18, 1969.

In *Watkins*, Division Two of the Court of Appeals reasoned that a failure to disclose should be treated as negligence and concluded that:

> [T]he question of whether or not a particular risk should be disclosed should have the same evidentiary requirements as any other act of malpractice. The standards of disclosure should require some medical testimony unless the disclosure is so obvious that laymen can recognize the necessity of such disclosure.

*Watkins v. Parpala, supra* at 492.

According to Comment, *Informed Consent in Medical Malpractice*, 55 Cal. L. Rev. 1396 (1967), the rule adopted in *Watkins* is in accord with the holdings of a majority of courts, and there is no discernible minority rule. The author of the comment, however, finds the majority rule unpalatable for two reasons. He first asserts that in fact there *are* no medical standards of disclosure and in practice there can be none because each patient is mentally and emotionally unique and must be so treated. His second reason for urging rejection of the majority rule is the so-called "con-

---

[1]In *Mason*, Judge Munson's comprehensive analysis of various approaches in applying the doctrine substantiates Prof. Plante's thesis that:

> [T]here is no basic conceptual, doctrinal or procedural innovation in the "informed consent" cases; that the use of this unfortunate journalistic expression has caused confusion in judicial opinions and in some of the commentary literature; that this confusion has generated litigation and will probably continue to do so; and that what is needed is a little careful thinking in the legal profession on some relatively elementary principles of the law of torts.

(Footnotes omitted.) *Plante, An Analysis of "Informed Consent"*, 36 Fordham L. Rev. 639 (1968).

spiracy of silence" in the medical profession which assertedly makes it virtually impossible for a malpractice plaintiff to secure the necessary expert testimony.

In the *Mason* case, Division Three of the Court of Appeals likewise rejects the apparent majority rule followed in *Watkins*. The reasoning of *Mason* is:

> The law applicable to informed consent must balance the conflicting right of the patient and duty of the doctor in an equitable fashion. The inviolability of the patient's body, which is firmly grounded in Anglo-American law, must be a starting point. Thus, the physician, absent an emergency, must not only explain the nature and consequences of a procedure, but also describe material risks peculiar to the procedure which may reasonably be foreseeable. *In this framework, expert medical testimony to establish a standard of disclosure by the plaintiff becomes unnecessary.* However, this does not prevent the physician from introducing evidence of such a standard, if in fact one exists; nor does it eliminate the necessity for some medical testimony to establish what is a reasonably foreseeable risk.

(Footnotes omitted. Italics ours.) *Mason v. Ellsworth, supra* at 311. The holding of *Mason* at page 313 is:

> Consequently we hold that a plaintiff, to establish a prima facie case when she was informed of the nature and purpose of the procedure, must allege and prove: (1) she was not informed of a reasonably foreseeable risk, *or* that she inquired of defendant as to any risks involved in the proposed procedure and was not informed of same; (2) if she had been informed, she would not have proceeded with the procedure; and (3) she has been injured as a result of submitting to the procedure.

We are also persuaded that the majority rule followed in *Watkins* should be rejected. *Accord, Woods v. Brumlop,* 71 N.M. 221, 377 P.2d 520 (1962). However, we do not adopt *Mason's* standard for the establishment of a prima facie case.

■ The physician-patient relationship is of a fiduciary character. The inherent necessity for trust and confidence requires scrupulous good faith on the part of the physician.

*Lockett v. Goodill,* 71 Wn.2d 654, 430 P.2d 589 (1967). His duty of disclosure extends beyond the realm of *risks.* He must disclose to his patient all material *facts* which reasonably should be known if his patient is to make an informed and intelligent decision. The availability of alternatives to surgery is an example of the kind of information required.

■ Whether the failure to disclose was willful or attributable to negligence is immaterial. The causal wrong is the violation of the fiduciary duty to disclose.

> We cannot agree that the matter of informed consent must be determined on the basis of medical testimony any more than that expert testimony of the standard practice is determinative in any other case involving a fiduciary relationship. We agree with appellant that a physician's duty to disclose is not governed by the standard practice of the physicians' community, but is a duty imposed by law which governs his conduct in the same manner as others in a similar fiduciary relationship. To hold otherwise would permit the medical profession to determine its own responsibilities . . .

*Berkey v. Anderson,* 1 Cal. App. 3d 790, 805, 82 Cal. Rptr. 67 (1969).

■ Reasons why the physician withheld facts are a matter of defense. Evidence that the patient was not uninformed or that the facts undisclosed were immaterial or that disclosure might be harmful would properly be matters of defense. It is at this juncture that evidence of medical standards of disclosure might become relevant and material.

> At the same time, the physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; this may well result in alarming a patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in actually increasing the risks by reason of the physiological results of the apprehension itself. The other is to recognize that each patient presents

a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent.

*Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, supra* at 578. In a given case, evidence of a medical standard might well persuade the trier of fact that the surgeon disclosed all facts which his patient *should* know for the purpose of an informed consent. But such proof should be the physician's burden and should be weighed as any other evidence and be judged by "reasonable man" standards of conduct.

Dr. Brown testified that the "risks" in a dermabrasion procedure were minimal. And, as he also observed, the contemplated surgery was "an elective thing." There was no emergency. His patient's health was not at stake. Arguably, one of the *facts* which Mrs. Hunter needed for an informed and intelligent decision was the percentage probability that the contemplated surgery would improve her appearance. Whether or not Dr. Brown violated his fiduciary duty in withholding the information is a question of fact to be judged by reasonable man standards.

The author of the California Law Review comment proposes an alternate to the medical standard of disclosure:

A physician is under an obligation (1) to make a full disclosure of all known material risks in a proposed operation or course of treatment except for those risks of which the patient is likely to know or (2) to prove the reasonableness of any lesser disclosure or the immateriality of the undisclosed risk.

(Footnotes omitted.) Comment, *Informed Consent in Medical Malpractice*, 55 Cal. L. Rev. 1396, 1407 (1967). Other than in its limiting use of the word "risks," we find the proposed standard to be practical and equitable and compatible with the physician's fiduciary duty.

We hold that if a patient-plaintiff presents substantial evidence that (1) his physician failed to disclose material

*facts* reasonably necessary to form the basis of an intelligent consent, and (2) he has been injured as a result of submitting to a surgical procedure, he has made out a prima facie case.

Accordingly, we reverse and remand for a new trial.

UTTER and WILLIAMS, JJ., concur.

Petition for rehearing denied June 10, 1971.

Review granted by Supreme Court July 23, 1971.