[No. 1945-1. Division One. May 20, 1974.]

PAUL S. HOLT et al., Respondents, v. REUBEN E. NELSON et al., Appellants.

*Williams, Lanza, Kastner & Gibbs* and *Henry E. Kastner* and *Fred M. Zeder*, for appellants.

*Shidler, McBroom, Gates & Baldwin* and *James R. Irwin*, for respondents.

CALLOW, J.—This is a medical malpractice case. The defendant doctor appeals from an order granting a new trial following a jury verdict in his favor.

The action, brought by Paul S. and Mary Jane Holt on behalf of themselves and as guardian ad litem for their daughter, Janice Holt, arises out of the pre-natal care and delivery of the child on December 22, 1966, by the defendant obstetrician. Following the birth, it became apparent that the child was a spastic quadriplegic with brain damage and cerebral palsy. At the time of the trial, she was 5½ years old and could not walk, talk or sit up by herself. She spent most of her days lying on her back and was able to move around only by bouncing on her back. She could recognize her mother and her family, was aware of people around her, and could respond by squealing when excited. She could speak a few words and respond to stories which were read to her. She was unable to eat ordinary food and was fed a liquid diet. From her birth to the time of the trial, she had been hospitalized more than 15 times at the Children's Orthopedic Hospital and she required continual care.

Prior to the delivery of the child on December 22, 1966, the mother had made regular visits to the doctor who had estimated that the probable date of birth would be December 8, 1966. Approximately 5 weeks before the expected birth, the mother had episodes of painless bleeding. At the time of the trial, there was testimony that the symptoms then exhibited indicated the condition known as placenta previa. This condition results when the placenta instead of being implanted in the upper portion of the uterus is implanted in the lower portion and wholly or partially covers the cervix, the opening of the uterus. This part of the womb

must dilate for the baby to be born. A partial placenta previa is one which does not cover the opening of the cervix completely while a total placenta previa does. As pregnancy progresses, the uterus stretches and tears away from a low lying placenta which remains fixed. The tearing causes bleeding.

The evidence further showed that the doctor rotated the baby on December 7, 1966, from a breech position. The child was not born on the expected date. On December 21, 1966, the mother was admitted to the hospital for observation because of bleeding and, on the following morning, was examined by the defendant doctor. She was taken to the delivery room where the doctor confirmed the diagnosis of partial placenta previa. The doctor then attempted to induce labor and administered a drug which would cause uterine contractions. In the early afternoon, it was noted that the fetal heart tones were poor, and a caesarean section was thereafter commenced. The child was limp at birth and was diagnosed as having suffered fetal anoxia, a lack of oxygen to the brain.

The plaintiffs claimed that the doctor had been negligent in (1) failing to diagnose partial placenta previa on or before December 8, 1966, (2) failing to deliver the baby by caesarean section before December 22, 1966, (3) failing to perform a caesarean section immediately following his examination of the mother early in the morning of December 22, 1966, (4) rupturing the membranes and attempting to induce labor and deliver the. baby vaginally instead of doing a caesarean section after examination of the mother on the morning of December 22, 1966, (5) not commencing the performance of the caesarean section early in the afternoon as soon as the decision was made to do so, (6) being unduly long in performing the caesarean section and removing the child, and (7) failing to give the parents the opportunity to make the choice of proceeding with the caesarean section at a time earlier than the doctor ultimately made the decision to, and did, perform the operation. The

instructions given by the trial court presented all of the claims of the plaintiffs to the jury save the last, which raised the issue of "informed consent."

The expert medical testimony during the trial was conflicting. Certain witnesses stated that the treatment given the patient was within the standard of care of obstetrical practice, and others stated that the treatment was improper. The jury returned a verdict for the defendant-doctor.

The plaintiffs moved for a new trial on the ground that the failure of the trial court to instruct the jury on the theory of informed consent was error. The trial court in granting a new trial observed that evidence had been presented concerning (a) the risks involved in proceeding with normal birth, (b) the risks of caesarean section and (c) of the standard of care which required an obstetrician to inform his patient of all choices and risks. The trial court also observed that the failure to instruct the jury on informed consent precluded the plaintiffs from arguing that theory of negligence to the jury.

The assignments raised by the appellant-doctor will be discussed by answering the issues of law presented. All of the issues are addressed to legal aspects of the theory of informed consent.

Was the right to the granting of a new trial for failure to instruct on "informed consent" preserved by the objections made to the trial court?

Counsel for the plaintiffs stated that he objected to the court's instruction setting forth the claimed negligence of the doctor because it omitted the portion of the plaintiffs' proposed instruction which read as follows:

> In failing to obtain the informed consent of the parents in electing to induce labor and attempt a vaginal delivery in the face of circumstances making a Caesarean Section the proper alternative;

In the objections to the proposed instructions, the counsel for the plaintiffs further stated that the plaintiff-mother

had testified that the doctor did not explain the risks involved in rupturing the membranes and attempting a vaginal delivery in the face of circumstances making a caesarean section the proper alternative. During the colloquy concerning the proposed instructions, the trial court inquired concerning informed consent; and the defense counsel stated that there was no evidence in the case as to what the standard of care would require a doctor to tell a patient under the circumstances and that there was no evidence as to what course the patient would have chosen had she been informed. While we find the wording of the omitted paragraph to be awkward, nonetheless it did frame the theory of the plaintiffs.

█ It is well settled that counsel objecting to the giving of any instruction and to the refusal to give a requested instruction must state distinctly the matter to which he objects and the grounds of objection specifying the particular part of the instruction to be given or refused and to which objection is made. CR 51(f). The purpose of requiring exceptions to be specific and definite is to apprise the court of the grounds for objection, enlighten the court on the theories of law which support the objector's position and enable the court to correct mistakes in time to avoid unnecessary retrials. *Moore v. Mayfair Tavern, Inc.,* 75 Wn.2d 401, 451 P.2d 669 (1969); *Bichl v. Poinier,* 71 Wn.2d 492, 429 P.2d 228 (1967); *Matthias v. Lehn & Fink Prods. Corp.,* 70 Wn.2d 541, 424 P.2d 284 (1967); *Roumel v. Fude,* 62 Wn.2d 397, 383 P.2d 283 (1963). A review of the record of the exception taken and the colloquy surrounding the taking of the exception show that the trial court was made aware of the issue of law raised, and the issue was fully discussed. The point in question was properly presented to the trial court and preserved for review.

Was there substantial evidence upon which to base the submission of the issue of informed consent to the jury?

An expert medical witness testifying on behalf of the plaintiffs was asked on direct examination whether a fail-

ure on the part of the obstetrician-defendant to tell the plaintiffs of the risks associated with placenta previa was a departure from the medical standard of care. It is apparent from the record that counsel presented evidence of a medical standard of care dealing with the duty of obstetricians to tell their patients of the risks to both mother and child associated with normal birth as opposed to caesarean section. (*See* Appendix.)[1]

Was it necessary to present evidence that the patient would have elected a course of treatment other than she received had she been informed of the risks present in her medical situation?

 The plaintiff-patient must prove the following elements to establish a case of physician negligence in failing to impart information so treatment could be chosen intelligently: (1) The defendant-doctor failed to inform the plaintiff-patient of alternative treatments, the reasonably foreseeable material risks of each alternative, and of no treatment at all. *Hunter v. Brown,* 81 Wn.2d 465, 502 P.2d 1194 (1972); *ZeBarth v. Swedish Hosp. Medical Center,* 81 Wn.2d 12, 499 P.2d 1 (1972); *Hunter v. Brown,* 4 Wn. App. 899, 484 P.2d 1162 (1971); *Watkins v. Parpala,* 2 Wn. App. 484, 469 P.2d 974 (1970). (2) The plaintiff-patient would have chosen no treatment or a different course of treatment had the alternatives and the material risks of each been made known. *Natanson v. Kline,* 187 Kan. 186, 354 P.2d 670 (1960); *ZeBarth v. Swedish Hosp. Medical Center, supra*; *Mason v. Ellsworth,* 3 Wn. App. 298, 474 P.2d 909 (1970). (3) The plaintiff has been injured as a result of submitting

[1] It is unnecessary to prove a medical standard of disclosure of the risks of treatment in order to recover on the negligence theory of informed consent. The law imposes the duty to disclose on the doctor. *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972); *Cobbs v. Grant,* 8 Cal. 3d 229, 502 P.2d 1, 104 Cal. Rptr. 505 (1972); *Getchell v. Mansfield,* 260 Ore. 174, 489 P.2d 953 (1971); *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972); *Miller v. Kennedy,* 11 Wn. App. 272, 522 P.2d 852 (1974); *Trogun v. Fruchtman,* 58 Wis. 2d 596, 207 N.W.2d 297 (1973). That issue is not presented in this case, however, evidence of a medical standard having been presented.

to the treatment. *Hunter v. Brown,* 4 Wn. App. 899, 908, 484 P.2d 1162 (1971); *Mason v. Ellsworth, supra.*

It is for the trier of the fact to determine from the evidence taken as a whole whether the plaintiff would have chosen a different treatment than that received. *ZeBarth v. Swedish Hosp. Medical Center, supra. Mason v. Ellsworth* required that the plaintiff allege and prove that had full information been provided a different course of treatment would have been chosen, but the *ZeBarth* case imposed only the requirement that the evidence be such that the jury could infer that the choice would have been different.[2] A party is competent to testify to his own state of mind whenever his own intent is a fact to be proven. *Silver v. Strohm,* 39 Wn.2d 1, 234 P.2d 481 (1951); *Anderson v. Ruberg,* 20 Wn.2d 103, 145 P.2d 890 (1944); *Thoresen v. St. Paul & Tacoma Lumber Co.,* 73 Wash. 99, 131 P. 645, 132 P. 860 (1913). In informed consent situations, such testimony should be allowed as a part of the totality of evidence even though self-serving and subject to that criticism under *W. G. Platts, Inc. v. Guess,* 56 Wn.2d 143, 351 P.2d 512 (1960) and *Stusser v. Gottstein,* 178 Wash. 360, 35 P.2d 5 (1934). Appropriate limitations upon the self-serving aspect of such testimony would be the cautions expressed in WPI 2.01, 6 Wash. Prac. 13 (1967). Appropriate to the resolution of this issue are the following words from *Funke v. Fieldman,* 212 Kan. 524, 512 P.2d 539 (1973), on pages 535-37:

> A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it. . . .
>
> . . .
>
> . . . Whether a patient would have refused treatment or a medical procedure had the physician made adequate disclosure is to be determined objectively. If adequate disclosure could reasonably be expected to have caused the patient to decline the treatment or procedure

---

[2]*Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972), presents causality to the jury on the objective basis of what would a prudent person in the patient's position have decided if informed of the material perils.

because of revelation of the kind of risk or danger which resulted in her harm, causation is shown but otherwise not, and the patient's testimony is relevant on such issue, but should not be controlling.

Would the proposed instruction have properly presented the issue of informed consent to the jury?

██ A doctor has a duty to obtain permission from his patient before treating the patient. If the doctor breaches this duty to obtain an informed consent from the patient before proceeding with treatment, the patient has a cause of action for damages against the doctor even if the doctor has *performed* the treatment properly within the standard of care of the profession. *ZeBarth v. Swedish Hosp. Medical Center, supra.* Thus, the cause of action can arise against a doctor for failing to obtain the patient's knowledgeable permission to the treatment even though the doctor's actions have not been negligent and would not give rise to a cause of action in any other way. 2 F. Harper & F. James, *The Law of Torts* § 17.1, at 59 (Supp. 1968); Annot., 79 A.L.R.2d 1028 (1961).

The rule has been that the physician's duty to disclose treatment alternatives and the risks of each alternative was a duty to be discharged according to the prevailing standard of care of other physicians in the community. *Green v. Hussey,* 127 Ill. App. 2d 174, 262 N.E.2d 156 (1970); *Haggerty v. McCarthy,* 344 Mass. 136, 181 N.E.2d 562, 94 A.L.R.2d 998 (1962); *Roberts v. Young,* 369 Mich. 133, 119 N.W.2d 627, 99 A.L.R.2d 1330 (1963); *ZeBarth v. Swedish Hosp. Medical Center, supra.* In *ZeBarth,* the court approved the instruction given which required the standard of care to be proven by the testimony of physicians but went on to recognize that there are other areas where the circumstances themselves so clearly indicate that the physician should have informed the patient that expert medical testimony is not necessary to establish a breach of duty. *See also Hunter v. Brown,* 4 Wn. App. 899, 905, 484 P.2d 1162 (1971); *Mason v. Ellsworth, supra.*

We need not decide in this case whether expert medical testimony to establish the standard of disclosure is essential because such testimony has been presented and is sufficient to support a jury conclusion that there was a violation of the standard of care. *See* Annot., 52 A.L.R.3d 1084 (1973). We note the trend is to approach the problem from the standpoint of the patient and his interests—requiring the physician to disclose all risks and material facts to the patient, *in any event*. Under the decisions from other jurisdictions if reasons existed for the withholding of such information, then the physician may present expert medical testimony to explain, as a matter of defense, why such information was withheld. It can be anticipated that whether a fact would be material or not could be answered only by medical testimony and would fall into the category of appropriate defense. The burden of explaining the lack of information to the patient is upon the physician; and under the following trio of cases, the patient need not establish that the failure to inform was a violation of the standard of care of the physician's peers. *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir. 1972), involved the duty to disclose the risk to a patient about to undergo a laminectomy. The defendant-doctor testified that there was a 1 percent risk of paralysis but that patients were not informed of it because of the possibilities of adverse psychological effects and that such information might deter a patient from needed surgery. It was held that consent by a patient to treatment could only be found if the following elements existed. (1) The physician disclosed all material risks of treatment to the patient whether the patient inquired concerning the risks or sought out the facts of his condition and its treatment or not. (2) The peril must be divulged to a patient if knowledge of it would be material to the patient's decision. The patient must be told the alternative risks of submitting to treatment, of remaining untreated and of the options, varieties and hazards of alternative treatment. (3) The choice of treatment is the patient's and not the physician's, and the physician may not with-

hold information either because the patient might refuse treatment or be psychologically affected by the knowledge of the risks of his condition. The court also held that the standard of disclosure need not be proven by medical testimony but could be measured by the jury evaluating whether the conduct of the doctor was reasonable under the circumstances. A risk was held to be material and required to be divulged if a reasonable person would attach significance to it in deciding whether or not to submit to the proposed treatment. *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972), likewise held that the doctor's duty to disclose material risks of proposed treatment should be governed by the patient's right to know and not by a standard of disclosure set by expert medical testimony. The court observed that the approach of the doctor to the patient's problem is, and should be, primarily a medical approach, while the patient's approach is personal; and it is the patient's right to make up his own mind and be the final judge as to what would be done to his body. *Cobbs v. Grant,* 8 Cal. 3d 229, 502 P.2d 1, 104 Cal. Rptr. 505 (1972), likewise held that it was the physician's overall obligation to the patient to disclose the available choices with respect to proposed therapy and the inherent and potential dangers involved in each course so that the patient will have all the necessary background information which he will need to decide which, if any, treatment to permit. The court stated on page 243:

> [T]here is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each.
> . . . Unlimited discretion in the physician is irreconcilable with the basic right of the patient to make the ultimate informed decision regarding the course of treatment to which he knowledgeably consents to be subjected.

The *Cobbs* case held that if the doctor then claimed a therapeutic privilege to withhold information which would upset the patient the doctor must affirmatively show the

reason and basis for the withholding. This approach to the theory of informed consent as discussed in *Canterbury v. Spence, Wilkinson v. Vesey,* and *Cobbs v. Grant* was foreseen in *Hunter v. Brown,* 4 Wn. App. 899, 906, 484 P.2d 1162 (1971), *aff'd,* 81 Wn.2d 465, 502 P.2d 1194 (1972), on review. We are in sympathy with the rationale of *Cooper v. Roberts,* 220 Pa. Super. 260, 286 A.2d 647 (1971), which relied upon *Berkey v. Anderson,* 1 Cal. App. 3d 790, 82 Cal. Rptr. 67 (1969), in holding that the physician's duty to disclose should not be governed by the standard practice among other physicians but should be governed by the patient's right to know all that will enable him to choose his own destiny. We reiterate that we need not adopt that approach to informed consent in this case since the medical testimony is present to support the submission of informed consent to the jury as a violation of the medical standard of care. Our discussion is presented as background to our consideration of the sufficiency of the proposed instruction.

In considering the sufficiency of the proposed instruction, a discussion of the instances when disclosure of risks and consent to treatment are unnecessary will be helpful. There are exceptions to the requirement that the physician secure the intelligent, informed permission to any treatment of the patient. Thus, a doctor may not be required to have disclosed any or every potential risk to a patient before proceeding with treatment under certain circumstances. Illustrative of exceptions to the requirement are the following: (1) A physician is not responsible for failing to disclose a risk which was not reasonably foreseeable and not inherent in the procedure. *Block v. McVay,* 80 S.D. 469, 126 N.W.2d 808 (1964). (2) A physician may not be responsible for failing to disclose a risk to a patient where full disclosure would be detrimental to the patient's best interests. *Roberts v. Wood,* 206 F. Supp. 579 (S.D. Ala. 1962); *Salgo v. Leland Stanford Jr. Univ. Board,* 154 Cal. App. 2d 560, 317 P.2d 170 (1957); *Nishi v. Hartwell,* 52 Hawaii 188, 473 P.2d 116 (1970); *Williams v. Menehan,* 191 Kan. 6, 379 P.2d 292 (1963). It must be remembered that this exception should

be considered in the light of the caveat that the primary duty is to inform the patient of his choices. Each case must be examined in the light of its circumstances as to whether the withholding of information was justified. Failure to disclose under this exception is a defense which must be proven by the doctor. *Stauffer v. Karabin,* 30 Colo. App. 357, 492 P.2d 862 (1971); *Watson v. Clutts,* 262 N.C. 153, 136 S.E.2d 617 (1964). (3) A physician has no duty to disclose dangers which are commonly known and it can be assumed that the patient will know of them. *Canterbury v. Spence, supra.* (4) A physician need not disclose to a patient risks of which he is already aware. *Canterbury v. Spence, supra.* (5) A physician need not disclose the hazards of treatment when the patient has requested she not be told about the dangers, has insisted on remaining ignorant of the perils involved and had the patient been told, the explanation might increase the risks of treatment because of the psychological results of the apprehension that might be produced. *Putensen v. Clay Adams, Inc.,* 12 Cal. App. 3d 1062, 91 Cal. Rptr. 319 (1970). (6) A physician need not have informed the patient of the risk of the procedure if the doctor can establish the defense that the patient would have proceeded whether he had been informed of the risks or not. *Shetter v. Rochelle,* 2 Ariz. App. 358, 409 P.2d 74 (1965). (7) A physician need not disclose risks which have no apparent materiality or relationship to the patient's decision. *Canterbury v. Spence, supra.* (8) A doctor need not disclose a risk of the improper performance of an appropriate procedure. *Mallett v. Pirkey,* 171 Colo. 271, 466 P.2d 466 (1970); *Mull v. Emory Univ., Inc.,* 114 Ga. App. 63, 150 S.E.2d 276 (1966). (9) A physician need not disclose the various alternatives and risks when an emergency situation exists requiring prompt treatment in the face of the immediate possibility of permanent injury or death and the patient is in no condition to determine for himself. *Dunham v. Wright,* 423 F.2d 940 (3d Cir. 1970); *Crouch v. Most,* 78 N.M. 406, 432 P.2d 250 (1967); *Schloen-*

*dorff v. Society of New York Hosp.*, 211 N.Y. 125, 105 N.E. 92 (1914), *overruled on other grounds* in *Bing v. Thunig*, 2 N.Y.2d 656, 143 N.E.2d 3, 163 N.Y.S. 3 (1957).

The precepts which have been discussed dictate that the elements which must exist to impose liability upon a physician under the informed consent doctrine are the existence of (a) a duty to inform, (b) a failure to inform, (c) evidence that, if informed, the patient would have chosen a different course of treatment, and (d) injury resulting from the treatment followed. The proposed instruction, in inexact language but in terms sufficient to advise the jury, set forth the claim that (a) the physician was negligent in not telling the parents about caesarean section as an alternative to vaginal birth, (b) that he did not tell the parents of the comparative risks, (c) that caesarean section would have been selected by the parents at an earlier time as the desired procedure had they been informed, and (d) that the injury to the child proximately resulted because the medical technique was performed too late. The trial of the action was completed shortly before the decision in *Ze-Barth v. Swedish* was filed. Neither court nor counsel had its guidance on the issue. It was error to delete the proposed paragraph from the instruction given to the jury, and the trial court was correct in granting a new trial on that basis.

If a new trial is granted, should it be limited to the issue of "informed consent" rather than granted on all issues?

CR 59(a) reads in part as follows:

(a) Grounds for Reconsideration or New Trial. The verdict or other decision may be vacated and a new trial granted to all or any of the parties and on all part of the issues when such issues are clearly and fairly separable and distinct, on the motion of the party aggrieved for any one of the following causes materially affecting the substantial rights of such parties[.]

The granting of a new trial is within the sound discretion of the trial court when the order is not based solely on rulings as to law, and the order will not be dis-

turbed on appeal in the absence of an abuse of discretion. *State v. Higgins,* 75 Wn.2d 110, 449 P.2d 393 (1969); *Osborn v. Lake Washington School Dist. 414,* 1 Wn. App. 534, 462 P.2d 966 (1969). While the trial court here has granted a new trial based upon the failure to instruct the jury on the theory of informed consent, intertwined with the ruling was the trial court's understanding and evaluation of the evidence concerning the duty to inform, the availability of alternatives and that the patient would have chosen the alternative if given the opportunity. A much stronger showing is required to reverse an order granting a new trial than is required to reverse an order denying a new trial. *Olpinski v. Clement,* 73 Wn.2d 944, 442 P.2d 260 (1968); *Benjamin v. Randell,* 2 Wn. App. 50, 467 P.2d 196 (1970). The granting of a new trial will be upheld if it is proper on any ground presented to the trial court. *Coleman v. Dennis,* 1 Wn. App. 299, 461 P.2d 552 (1969).

In *Myers v. Smith,* 51 Wn.2d 700, 321 P.2d 551 (1958), it was said that a limited new trial may be beneficial to the advancement of the administration of justice but should not be jeopardized by wholesale misapplication. In that case, it was observed that the question of liability was not free from doubt but that the evidence on both sides of liability was substantial and conflicting. Where the initial trial has settled the issue of liability without error but the question of damages remains to be resolved, a retrial on damages alone may be entirely proper. *McCurdy v. Union Pac. R.R.,* 68 Wn.2d 457, 413 P.2d 617 (1966). When a theory of liability is yet unresolved and the evidence to establish the theory will explore many of the areas of other theories of liability, a different problem is presented. A limitation of issues on retrial should only be imposed where the issue to be retried is so distinct and separable from the other issues that a trial of that issue alone can take place without injustice or complication. *Cramer v. Bock,* 21 Wn.2d 13, 149 P.2d 525 (1944). We agree with the trial

court that the presentation of evidence on all issues should not be restricted upon retrial.

The judgment is affirmed.

HOROWITZ and FARRIS, JJ., concur.

Petition for rehearing denied July 18, 1974.

Review denied by Supreme Court October 10, 1974.

#### APPENDIX

[Plaintiffs' Counsel]: My position is this, Mr. Kastner, had Mrs. Holt been informed of the risks, she would have elected to go for a Cesarean section.

[Defendants' Counsel]: I see, all right.

Q Doctor, can we get back to that. What is the duty of the standard obstetrician to tell his patient what is going on?

A [Dr. Herrmann] I think it is of paramount importance that the patient be informed at all times of the existing condition to the best of the knowledge of the physician, and to the best of his ability to transmit this information. The patient must also be informed of possible outcome of management that is planned, and alternative systems of management. I think it is for the average obstetrician, the average obstetrician no longer attempts to keep this all to himself and then make his judgment. My opinion, the average obstetrician in this community will indeed present his patient with alternatives of treatment, if such alternatives exist, to make her part of the decision-making process.

Q [Plaintiffs' Counsel] Let's go through this. Given the history I read to you on Friday and the facts of this case, what should he have told her?

A [Dr. Herrmann] He would have told her on the positive side for immediate Cesarean section, whether or not she was in good shape as far as he could judge at this time of the baby, the good shape of the mother, and also the ability to plan the Cesarean at the time when everybody is surrounded, optimum treatment conditions exist at the hospital. This is all the avenues of a planned Cesarean section versus a vaginal delivery which may occur at anytime, . . . and further-more, the assembling of an operating team always involves some time, and if it is attempted vaginal delivery or, at least, the intention of the doctor to have a vaginal delivery and it fails, Cesarean has to be done, the ultimate outcome and the emergency section is more less [sic] severe than one that's formally scheduled. . . .

Q [Plaintiffs' Counsel] Let's assume the patient has elected to have a Cesarean section under planned rather than under emergency circum-stances, do you have an opinion as to whether or not, based on reasonable medical probability, Janice Holt would be brain damaged today?

[Defendants' Counsel]: Objection, the same question was asked

before of the doctor's opinion, of an earlier opinion of a section, and this is rephrasing it with a little different preparatory remarks.

THE COURT: Sustained.

[Plaintiffs' Counsel] If the Court please, I don't believe this is the same circumstances.

. . .

[Defendants' Counsel] If the Court please, the doctor testified on Friday that if a section had been performed earlier, there wouldn't have been a brain damage. . . . All counsel is doing again is asking him if plaintiff had been told about it and elected to do this Cesarean section, would there have been any brain damage. Just the same question. Why she would undergo it is immaterial. I feel this repetitive-type questioning is improper.

THE COURT: What is different in this question than the other question?

[Plaintiffs' Counsel]: Your Honor, the first question, Dr. Nelson made the decision for her and he decided he was in effect going to put her fetus in jeopardy. In the second question she has a choice of whether or not she is going to have a Cesarean. When I asked the doctor on the stand whether or not it must logically follow, if the patient had elected to have a Cesarean, . . . what would have happened to the baby—

THE COURT: The doctor has testified that had a Cesarean been done on November 16, that the baby would not have sustained brain damage. I don't see what difference it makes as to that and, at least, since the ultimate question is what the damage to the baby would have been. I don't see whether it makes any difference the doctor made the choice without telling her of Cesarean or he told her and she elected.

It is clear from the evidence the doctor says the patient should have been given that choice, and the doctor made the bad choice so that either way you have that evidence in.

[Plaintiffs' Counsel]: Excuse me, your Honor, I was going to suggest on the record to make an offer of proof as to what the doctor would testify.

THE COURT: All right.

[Plaintiffs' Counsel]: Simply my offer of proof would be, and it is subjective, we would show this, Mary Jane Holt would have elected to have a Cesarean.

THE COURT: Through the doctor you would propose?

[Plaintiffs' Counsel]: Through the doctor we would propose had she elected and had a Cesarean done.

. . .

[Plaintiffs' Counsel]: Your Honor, perhaps I should explain this is not a case of one departure under the standard of care. This is a case of repeated departures from the standard of care. Some of the standards are causes and some are probable causes. We can't say for sure which act or which omission of an act caused this damage. But we can say in here, your Honor, some time between November 17 and December 21 Mrs. Holt should have been given the choice. We can also say that had the baby been delivered at any time prior to December 21 by

Cesarean section, based on medical probability, the doctor will testify that it would not have been brain damaged by that date.

THE COURT: I think to the extent that your questions asks about elections to do a Cesarean after November 17 and before December 21 or 22, it is a different question. I don't think the doctor has expressed an opinion about that period of time. He has got an opinion on the record about that date in November in which she was in the hospital. If your question is directed now to any period after she left the hospital and before she delivered, before the 21st or 2nd, then I would allow the doctor to answer.

[Plaintiffs' Counsel]: Your Honor, with all the objections going on here, it is very hard to present the case.

THE COURT: Mr. Genis, this is a very technical area and between you and me and all of us here, I don't think there has been an unusual amount of objections going on, but that is a gratuity on my part.

[Plaintiffs' Counsel]: I'm sorry.

[Plaintiffs' Counsel]: Your Honor, maybe the way we could leave this, have the reporter indicate to the specific question the brain damage to the baby could have been avoided had he done a Cesarean and, perhaps, Mr. Genis could rephrase the question and ask about the period of time in question.

THE COURT: Do you mean by that what?

[Plaintiffs' Counsel]: November 17 to December 21.

THE COURT: From the time after she had left the hospital to —

[Plaintiffs' Counsel]: No, had he done a Cesarean prior to December 21, the probabilities or the baby wouldn't have sustained brain damage.

THE COURT: That would be an appropriate question. . . .

. . .

THE COURT: Please be seated.

Q [Plaintiffs' Counsel] Doctor, do you have an opinion as to if a Cesarean had been performed prior to December 21 and after November 17, whether the brain damage could have been avoided in this case?

A [Dr. Herrmann] Yes.

Q [Plaintiffs' Counsel] And can we have your opinion, please?

A [Dr. Herrmann] The expectant attitude, that is, temperature rising to the point where things go sour are extremely dangerous and, therefore, the extra insurance of the baby while the baby was healthy, undoubtedly, would have provided this baby with the best possible chance under the circumstances and prevented it from exposure to lack of oxygen as it suffered under the actual event as it occurred here.