PLATTA, Appellant, v. FLATLEY, M.D., Respondent.

*No. 331. Argued March 4, 1975.—Decided April 10, 1975.*
(Also reported in 227 N. W. 2d 898.)

48

For the appellant there were briefs by *Frisch, Dudek & Slattery,* attorneys, and *Robert A. Slattery* and *Thomas*

*J. Arenz* of counsel, all of Milwaukee, and oral argument by *Robert A. Slattery*.

For the respondent there was a brief by *Borgelt, Powell, Peterson & Frauen*, attorneys, and *Reuben W. Peterson, Jr.* of counsel, all of Milwaukee, and oral argument by *Reuben W. Peterson, Jr.*

BEILFUSS, J. Although the plaintiff-appellant raises several issues, the main thrust of her argument is that the defendant-respondent doctor was negligent as a matter of law. The doctor responds by asserting that there is a factual dispute in the evidence and that credible evidence clearly supports the jury finding of no negligence.

Because this is basically a sufficiency of the evidence question, a discussion of some of the evidence is necessary.

The plaintiff-appellant, a California resident, first sought the care of the defendant-doctor on December 10, 1968. At the initial consultation she related a history of foot trouble beginning with the development of calluses in 1934, when she was seventeen years of age. Additional calluses developed through the years which the plaintiff had trimmed and taped by chiropodists. By 1958, her toes took on a curved or claw-like shape, corns developed on them and she could be on her feet for only six or seven hours at a time. In 1959, a California doctor diagnosed her condition as hammer toe deformities and performed an operation involving the removal of bones known as the proximal phalanges of the lesser four toes.

Each toe has three phalanges. The proximal phalanges are adjacent to the metatarsal or large bone of the foot. The removal of the proximal phalanges also removes the joint between the toes and the main part of the foot and significantly changes the weight-bearing characteristics of the foot as a whole. With no bony connection between the toes and the metatarsal, the nor-

mal function of the toes is changed and affects balance, walking and weight bearing.

Following the operation the condition of the plaintiff's feet was somewhat better—she was able to straighten her toes and the corns disappeared; however, the calluses reappeared and she still experienced pain by the end of the day. The plaintiff's toes became shorter and quite floppy. By 1968 she had developed a "duck-like" gait.

In 1963, the plaintiff started her own business described as a welcome-wagon-type promotion plan for local merchants. This business required her to be on her feet several hours a day, visiting stores in an effort to sell the advertising scheme. The plaintiff told the defendant that the more she walked the more pain she experienced and by the end of the workday she could not wait to get off her feet.

Based on the plaintiff's medical history, X rays and a physical examination, Dr. Flatley diagnosed her condition as bilateral metatarsalgia and discussed possible treatments with her. He explained the alternatives of "conservative" or nonoperative treatment involving the wearing of special shoes with pads or bars, and surgical treatment involving the removal of the five metatarsal heads on the ball of each foot. Although Dr. Flatley recommended the surgical treatment, he explained to the plaintiff that a bilateral resection of the metatarsal heads was a painful operation and was warranted only if the plaintiff was experiencing considerable pain.

Dr. Flatley testified that he was aware that the plaintiff's job required considerable walking, that she wanted to continue her business and that he took this into consideration in recommending the surgery; that his primary reason for suggesting surgery was to reduce the amount of pain suffered when she walked; that he told her the operation would not restore her feet to normalcy but that he anticipated, although he did not guarantee,

that she would be able to walk better; that he told her that the metatarsal heads of all ten toes would be removed; that he warned the plaintiff that casts and crutches would be necessary for a period of time and that it may take one year to recover from the effects of the surgery and that corrective shoes and padding would still be necessary.

He further testified that he did not recall specifically telling the plaintiff that the surgery could potentially increase the pain in her feet; that the bones to be removed formulated the weight-bearing portion of her forefeet; that there was a possibility that pain medication would be necessary; or that she might no longer be able to work at a job requiring extensive walking.

The plaintiff stated that she knew the operation was going to be painful but that defendant did not tell her that bone would be removed and did not discuss with her any risks or hazards of the operative procedure. She felt that corrective shoes and pads had not helped her in the past and that she experienced sufficient pain to warrant the surgery.

The plaintiff signed a consent form and the operation was performed without complications on December 23, 1968. The defendant next saw the plaintiff on January 20, 1969, when the casts were removed and satisfactory progress was noted. The plaintiff testified that upon returning to California her walking was somewhat improved, that she tried dancing on occasion, that she cut grass and that she attempted to play golf three or four times. The plaintiff corresponded with the defendant reporting on her condition and complaining of discomfort. In answer he wrote that she should wear low heeled shoes, that "aches and pains are not uncommon in the first six months following surgery," and that he would like to see her later in the spring. The plaintiff traveled to Wisconsin and saw the defendant on August

13, 1969. An examination revealed a callus and the defendant provided rubber pads for her shoes and encouraged her to walk with a heel-and-toe gait.

The plaintiff testified that the last time she saw the defendant, in August of 1969, he told her to accept the fact that she was disabled. She stated that, at the time of the trial, she could only walk the distance of one block before having to sit down, that her feet hurt even when propped up and that because of this she could no longer carry on her business.

On March 31, 1970, the plaintiff consulted Dr. William McIvor, an orthopedic surgeon practicing in California. At trial Dr. McIvor, called as an expert witness by the plaintiff, testified with respect to the operation performed by the defendant as follows:

". . . When this involves removal of the metatarsal heads it is my—it would be—it would, in my opinion, not be wise really based on my training and my experience. This is a matter of medical opinion. I personally would not resect metatarsal heads except in a rheumatoid patient.

". . .

". . . I can simply state what the standard practice is in this community and in this area, and I would say that this is not the usual and accepted procedure for this particular problem in this geographic area."

However, he admitted to not knowing what the standards of medical practice were in Milwaukee:

". . . There are certaintly differences in the approach to any medical problem from one area to another. I have no personal experience in respect to Milwaukee, and therefore really can't make any statement."

Dr. McIvor stated that he did not know the actual condition of the plaintiff's feet as seen by the defendant in December of 1968, or the circumstances under which he was treating her, including the extent of her disability and pain.

Dr. Henri Du Vries, a podiatrist who had practiced in Chicago and California, testified that he did not think there was any difference between orthopedic surgical standards in those two localities. He stated that the performance of a bilateral metatarsal head resection is not in conformity with the generally accepted standards of skill, care and judgment usually exercised by reputable orthopedic surgeons as a means of treating diffused plantar calluses, which was his diagnosis of the plaintiff's condition in 1968. He terms the operation "an extremely destructive piece of surgery" which "disabled [plaintiff] for the rest of her life." On cross-examination he stated that he did not know whether the plaintiff's feet, prior to the 1968 operation, were disabled or whether she had difficulty working due to pain, but that he did not consider her condition at that time to be serious.

Dr. Robert Cassidy, a Milwaukee orthopedic surgeon, who examined the plaintiff on April 11, 1972, testified as an expert for the defendant. In his opinion the metatarsal resection was an acceptable procedure in view of the amount of discomfort and difficulty the plaintiff had had over the years. He stated that in December of 1968, in view of the condition of the plaintiff's feet as presented to the defendant, two courses of treatment were possible—continuance of conservative care involving padding and the wearing of special shoes, or some type of surgical procedure to realign the weight-bearing portion of the foot, resection of the metatarsal heads being the primary procedure available. The defendant also testified that, in his opinion, the operation he performed on the plaintiff conformed with the exercise of care, skill and judgment exercised by orthopedic surgeons in Milwaukee county considering the circumstances and condition of the plaintiff's feet.

No contention is made that the defendant was negligent in his performance of the operation, rather it is

his selection of treatment that is challenged. With regard to this issue, the plaintiff argues that the record contains undisputed evidence that she had functional feet before being treated by the defendant, that the surgery he performed is destructive by nature and that such destructive surgery is not appropriate where the patient has functional feet.

Based upon the evidence presented at trial, the jury here found no negligence on the part of the defendant and this finding was affirmed by the trial court. The standards of review applicable to this situation are as follows:

"This is a jury verdict which has the full approval of the trial court. It is not to be upset if there is any credible evidence which under any reasonable view fairly admits of an inference supporting the findings. . . ." *Carr v. Amusement, Inc.* (1970), 47 Wis. 2d 368, 371, 177 N. W. 2d 388, citing and quoting *Delaney v. Prudential Ins. Co.* (1966), 29 Wis. 2d 345, 349, 139 N. W. 2d 48, where this court stated:

". . . we must judge the jury verdict in the light of the familiar rules that (1) a jury verdict will not be upset if there is any credible evidence which under any reasonable view fairly admits of an inference supporting the findings, (2) this is particularly true when the verdict has the blessing of the trial court, and (3) the evidence is to be viewed in the light most favorable to the verdict."

The issue thus presented is whether there is any credible evidence which under any reasonable view fairly admits of an inference supporting the jury finding of no negligence.

The standard of care in effect at the time of this trial by which defendant's care and treatment of plaintiff is to be judged was set out in *Trogun v. Fruchtman* (1973), 58 Wis. 2d 569, 584, 207 N. W. 2d 297:

" 'When a physician exercises that degree of care, diligence, judgment, and skill which physicians in good standing of the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having due regard to the advanced state of medical or surgical science at the time, he has discharged his legal duty to his patient.'

In order to prevail a plaintiff must prove the defendant failed to give him, not the highest degree of care, but merely the reasonable care and skill usually possessed by physicians of the same school and locality. . . ."

Additionally, the jury was correctly instructed by the trial court that:

"The mere fact that a bad result may have followed the treatment administered by the defendant does not, in itself, require you to find that he was negligent in his treatment of the plaintiff. If the defendant, Dr. Thomas J. Flatley, exercised the degree of care, skill, and judgment required of him, as heretofore stated, he cannot be found negligent simply on the basis of the results obtained.

"The defendant, Dr. Thomas J. Flatley, was not required to exercise the utmost or highest degree of skill, care or judgment known to the medical profession in his treatment of the condition of the plaintiff's feet. He was neither a guarantor nor an insurer of plaintiff's cure. He is not accountable for honest mistakes in judgment if his decisions on treatment were made with the care and skill required of him as a practitioner in his school of medicine.

"If you find from the credible evidence that his school of medicine recognized more than one method of treatment for the condition of the plaintiff's feet, you are instructed that the defendant was at liberty to select any of said methods. He was not negligent merely because he made a choice of a recognized alternative method of treatment, if he exercised the required care, skill, and judgment in administering and following the method of his choice. This would be true even though other medical witnesses may not agree with him on the choice made.

"The standards of care, skill, and judgment applicable to a doctor in a certain school of medicine are not matters within the common knowledge or experience of jurors or lay persons. These standards are within the special knowledge of experts in the field of medicine and can only be established by their testimony. Therefore, the care, skill, and judgment usually possessed and exercised. by physicians in the same school of medicine, in this or like communities, under like or similar circumstances, considering the advanced state of medical science, is to be determined only by the testimony of expert medical witnesses. You may not speculate or guess what these standards of care, skill, and judgment are or attempt to determine them otherwise than from the testimony of the medical experts called for that purpose."

The evidence offered to establish whether the performance of a bilateral metatarsal resection on this plaintiff conformed to the applicable standard consisted of the testimony of two California doctors and two Milwaukee doctors, one of which was the defendant. The California physicians opined that the operation was not appropriate under the standard, although one of them confined his opinion to the California area and refused to comment on the practices employed in Milwaukee. On the other hand, Dr. Cassidy, the primary expert witness for the defense, found the treatment to be fully warranted under the circumstances and accepted procedures employed in the Milwaukee area. Thus, the evidence of conformity with the standard of care was disputed.

Considering the testimony of Dr. Cassidy, this record contains sufficient credible evidence for the jury to have reasonably concluded that in performing a bilateral metatarsal resection on the plaintiff, the defendant exercised that degree of care, diligence, judgment and skill which physicians in good standing of the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having due regard

to the advanced state of medical or surgical science at the time.

The plaintiff, however, seeks to discredit the opinion of Dr. Cassidy by contending that it was based upon an unestablished assumption, *i.e.*, that the plaintiff had experienced substantially increased difficulties with her feet during the years before 1968.[1]

An examination of the record reveals that there was sufficient evidence for Dr. Cassidy, and the jury, to conclude that the pain the plaintiff experienced in her feet did in fact increase during the period from 1959 to 1968. The plaintiff testified that in 1963 her feet were painful at the end of the day:

"*Q.* No. I'm talking about '63. I want to know what the condition of your feet were in 1963, this is after the operation.
"*A.* After that former operation they were somewhat better, but they were still painful at the end of the day, the bottom of my feet."

She stated that prior to the 1968 operation her feet caused her pain after four or five hours:

"*Q.* . . . Before the performance of the surgery, did your feet cause you pain other than when you had walked on them for a period of hours?
"*A.* No.
"*Q.* I think you said four or five hours?
"*A.* That's right."

She also testified as follows:

"*Q.* Right from the beginning they hurt at the end of the day; is that correct?
"*A.* That's correct, they always have.
"*Q.* But later on they were hurting earlier in the day?
"*A.* What time are we talking about?

[1] *See: Rabata v. Dohner* (1969), 45 Wis. 2d 111, 172 N. W. 2d 409.

"*Q.* Oh, as you got into the late 1960's, 1966, 1967?
"*A.* Yes, they would."

Thus, there was sufficient evidence for the jury to find that the pain in plaintiff's feet did increase from 1959 to 1968; that, taking this into consideration, the operation performed by the defendant was a proper surgical treatment and that the defendant was therefore not negligent in his care and treatment of the plaintiff.

The plaintiff next argues that the evidence is undisputed that the defendant failed to adequately advise the plaintiff of the risks attending the proposed surgery and, having offered no explanation for such failure, the defendant must be found negligent as a matter of law.

Both parties rely on *Trogun v. Fruchtman, supra,* page 604, where, with respect to informed consent, this court held:

"We conclude that the burden of proof is on the plaintiff to establish a physician's failure to disclose particular risk information in connection with contemplated treatment, the patient's lack of knowledge of that risk and the adverse effects upon him which followed that treatment. Experts are unnecessary to establish the materiality of the risk to a patient's decision to undergo treatment or to the 'reasonably, expectable effect of risk disclosure on the decision.' Once the plaintiff has established a prima facie showing of a failure of the physician to inform the patient, the physician must come forward with his explanation of the reasons for not so informing the patient, including evidence that such advice was not customarily given."

In this case the jury instructions on the issue of informed consent are not challenged.[2]

There is no question that the defendant was under a duty to disclose before obtaining the plaintiff's con-

---

[2] In *Scaria v. St. Paul Fire & Marine Ins. Co.,* ante, p. 1, 227 N. W. 2d 647, the doctrine of informed consent is discussed and the standards to be applied are set forth.

sent to the surgical procedure. The issue, however, is whether that duty was breached, presenting the narrower question of whether there was a failure to disclose "particular risk information." The plaintiff argues that both her testimony and that of the defendant reveals a total absence of evidence that the defendant advised the plaintiff of the risks and hazards attending the proposed surgery. Specifically, the plaintiff alleges that the defendant failed to advise her that the proposed operation involved the removal of the weight-bearing portion of her feet; that the plaintiff might experience an increase in pain; that she would require daily pain medication and the use of special shoes and a cane; and that she might be unable to work in her business. However, the defendant testified that while he anticipated a reduction in pain there was no guarantee. He further testified, as follows, regarding his discussion of the procedure with the plaintiff:

"*A.* We would have discussed the X rays and the relative length of the metatarsals, the calluses, and the pain that she was having. And the primary treatment in any of these cases is conservative. By 'conservative' I mean nonoperative. And the continution with wearing special Oxford shoes with pads or with bars underneath them. And the other form of treatment, if that wasn't doing any good if that wasn't helping, would be surgical. And in my opinion on this case the removal of the five metatarsal heads was the operation that would be my choice. There are other operations, I know one of them has been stated in the testimony, it's a partial condylectomy. In my training and experience in this community that operation was no good and, therefore, was not indicated, especially was not indicated in this case, because of the relative length of the second, third, and fourth metatarsal heads. And that I felt that just removing the bottom would not help, that she would still be rolling forward on the elongated metatarsal heads. And that based on my training and schooling and judgment the resection of the five metatarsal heads was the operation that would

best, hopefully, offer her a chance for some relief of pain. And, certainly, not total relief of pain, because if you take out five metatarsal heads your weight bearing has shifted to the shafts of the bone, the so-called hollow parts of the bones, the parts that are harder in essence really than the heads, but it shifted to that and to the soft fatty fibrous tissue in that area. If you are going to do this you are not going to have a normal foot in any way, you are still going to have to wear Oxford shoes and pads. But it would help if you will shift the weight bearing more towards the center of the foot, and take them off the area where those calluses were.

"Q. What did Mrs. Platta respond to this discussion, how did she respond?

" . . .

"A. She thought that she was having enough pain that she preferred not to go on with the conservative management. And if I thought surgery was necessary then she would have it. . . ."

The only points upon which there is undisputed testimony as to nondisclosure are: (1) That plaintiff may possibly have to take pain-killing medication, and (2) that there was a possibility that the plaintiff would be unable to continue in the same business. Both of these instances of nondisclosure arguably fall into the category of "dangers . . . of which persons of average sophistication are aware" [3] and which are not subject to verbal disclosure. Or, they are at least "open to debate by reasonable-minded men," [4] thus creating an issue for the jury. With regard to the pain-killing drugs, the plaintiff admitted that the defendant warned her that the operation and recovery period would be painful. A person of average sophistication would anticipate that pain medication would be necessary. As to the plaintiff's inability to carry on her advertising business, there was testimony that plaintiff's husband died in December of 1967, and as a result the plaintiff became depressed and

[3] *Canterbury v. Spence* (D. C. Cir. 1972), 464 Fed. 2d 772, 778.
[4] *Id.* at page 788.

stayed home quite a bit, going down to the office only once in awhile to make telephone calls. It was therefore reasonable for the jury to conclude that these two instances of nondisclosure did not amount to inadequate disclosure by the defendant.

It cannot be said that there was undisputed evidence of failure to disclose "particular risk information" in this case. The plaintiff's argument that sec. 903.01 of the Wisconsin Rules of Evidence creates a presumption of negligence must fail since the reasoning of that argument is based on the conclusion that evidence of nondisclosure is undisputed. Likewise, the cases cited by the plaintiff in support of the contention that the defendant failed in his duty to make a reasonable disclosure as a matter of law are distinguishable either because they involved a total absence of evidence of disclosure, *Natanson v. Kline* (1960), 186 Kan. 393, 350 Pac. 2d 1093, rehearing denied, 187 Kan. 186, 354 Pac. 2d 670; *Collins v. Meeker* (1967), 198 Kan. 390, 424 Pac. 2d 488; because the issue of informed consent was not involved, *Dowling v. Mutual Life Ins. Co. of New York* (La. 1964), 168 So. 2d 107; because a misleading or false statement was involved, *Funke v. Fieldman* (1973), 212 Kan. 524, 512 Pac. 2d 539; or because the holding of the case does not support plaintiff's position, *Stauffer v. Karabin* (Colo. 1971), 492 Pac. 2d 862 (liability not established as a matter of law, rather the determination was for the jury) ; *Hunter v. Brown* (1971), 4 Wash. App. 899, 484 Pac. 2d 1162 (reversing directed verdict for defendant and remanding for a new trial on the basis that plaintiff made out a prima facie case of nondisclosure).

Here the fact question of whether or not the defendant failed to disclose to the plaintiff any significant risk inherent in the suggested surgery was a jury question. The facts in this case are not so clear that it can be

said, as a matter of law, that the defendant failed to disclose "particular risk information." The jury finding of no negligence with respect to disclosure was properly approved by the trial court.

The plaintiff contends that the trial court committed prejudicial error in instructing the jury on the locality rule contrary to the holding of *Shier v. Freedman* (1973), 58 Wis. 2d 269, 206 N. W. 2d 166, 208 N. W. 2d 328. In abrogating the locality rule in *Shier,* this court noted at page 283, footnote 2, that: "This change is not retroactive and will affect only those cases tried after the date of this opinion." The date of the *Shier* opinion was April 20, 1973. In the present case the jury instructions were read and the special verdict answered on April 4, 1973. Because the case was tried prior to the *Shier* opinion, the holding of that case regarding the locality rule instruction is not applicable here.

Notwithstanding *Shier,* the plaintiff argues that the giving of the instruction was error in that it was prejudicial and contrary to undisputed proof that surgical standards in Milwaukee are not different from those in other parts of the nation. However, nowhere in the record did the plaintiff object to the locality instruction or ask for an instruction of a national standard.[5] Rather, the record reveals that the plaintiff requested, almost word for word, the locality instruction as given by the trial court and made no objection in the motion after verdict to the instruction as given.

The practice of this court is not to consider an issue raised for the first time on appeal. *Terpstra v. Soiltest, Inc.* (1974), 63 Wis. 2d 585, 593, 218 N. W. 2d 129. *See also: Benzschawel v. Stoll* (1974), 64 Wis. 2d 211,

[5] *See: Scaria v. St. Paul Fire & Marine Ins. Co., supra,* where, upon a new trial, the plaintiffs are to be given the benefit of the abrogation of the locality rule.

213, 214, 218 N. W. 2d 748, where, in a per curiam opinion, this court held:

"However, in the present case we do not find the issue of the locality rule was properly raised in the trial court. We would not be adverse to extending the benefit of the abrogation of the locality rule in the instant case if the question had been properly raised and preserved. No place in the record do we find the Benzschawels objecting to the locality instruction or asking for instructions of a national standard. After the court had instructed the jury, the trial judge inquired whether counsel for either side wanted to object to or call the attention of the court to anything about the instruction as given. Benzschawels said they did not. From the record, apparently the first time the Benzschawels made any objection to the locality instruction was by way of motions after verdict. This objection comes too late."

The plaintiff's challenge to the locality rule instruction in this case cannot prevail.

The plaintiff alleges prejudicial error on the part of the trial court in not permitting the plaintiff to pursue certain lines of cross-examination. Not only are the plaintiff's allegations of error unclear but they are not raised on posttrial motions. The objection comes too late. *Terpstra v. Soiltest, Inc., supra.*

Other assignments of error are listed in plaintiff's brief under "Questions Involved." However, while these were raised on the posttrial motions, they were not argued in the brief nor at oral argument and will not be considered.

The basic issues between the parties primarily involved disputed questions of fact. The record does contain sufficient credible evidence to support the findings of fact arrived at by the jury. The case was tried upon the proper legal theories and no errors prejudicial to the plaintiff appear in the record as to the admissibility

of evidence or the instructions to the jury. The judgment should be affirmed.

*By the Court.*—Judgment affirmed.

ROBERT W. HANSEN, J. *(concurring)*. For reasons stated in the dissenting opinion in *Scaria v. St. Paul Fire & Marine Ins. Co.*, ante, p. 1, the writer would adopt the unitary standard of care, based on conformity to the approved medical practice under the circumstances as to (1) diagnosis, (2) care and treatment, and (3) duty to inform in physician-patient situations.

I am authorized to state that Mr. Justice LEO B. HANLEY joins in this concurring opinion.